## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MICHIGAN

## DETROIT DIVISION

| | |
|---|---|
| | ) No. |
| JONATHAN WILKOF, Individually and on Behalf of All Others Similarly Situated, | ) |
| | ) <u>CLASS ACTION</u> |
| | ) |
| Plaintiff, | ) **COMPLAINT FOR VIOLATIONS** |
| | ) **OF THE FEDERAL SECURITIES** |
| v. | ) **LAWS** |
| | ) |
| CARACO PHARMACEUTICAL LABORATORIES, LTD., DANIEL H. MOVENS, AND MUKUL RATHI, | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) <u>DEMAND FOR JURY TRIAL</u> |
| | ) |

Plaintiff Jonathan Wilkof, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Caraco Pharmaceutical Laboratories, Ltd. ("Caraco" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Caraco; and (c) review of other publicly available information concerning Caraco.

## <u>NATURE OF THE ACTION AND OVERVIEW</u>

1.      This is a federal class action on behalf of purchasers of Caraco's securities between May 29, 2008 and June 25, 2009, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Caraco is engaged primarily in the business of developing, manufacturing, marketing and distributing generic and private-label pharmaceuticals to the nation's largest wholesalers, distributors, warehousing and non-warehousing chain drugstores and managed care providers, throughout the U.S. These products are intended to treat a variety of disorders including but not limited to the following: hypertension, arthritis, epilepsy, diabetes, antipsychotic, depression and pain management.

3.    During the Class Period, Caraco represented that its facilities were up to par and maintained in accordance with the United States Food and Drug Administration ("FDA") guidelines. On November 3, 2008, Caraco revealed that the Company had received a warning letter from the FDA. Caraco disclosed that the letter was issued as a follow up to the last FDA inspection of the Company's manufacturing facility in Detroit, Michigan which was initiated in May 2008 and resulted in the issuance of a Form 483 in June 2008 following the inspection. Caraco, however, represented to investors that the Company had responded to all the observations made in the Form 483 and that Caraco had taken "corrective actions," which were "substantially completed."

4.    On this news, over the next three days, shares of Caraco declined by $2.26 per share, more than 22%, to close on November 5, 2008, at $7.91 per share, on unusually heavy volume.

5.    On March 31, 2009, Caraco further disclosed that it had commenced a voluntary recall, with the knowledge of the FDA, of certain tablets manufactured by the Company because the tablets might have differed in size and therefore could have more or less of the active ingredient.

6.    On this news, shares of Caraco declined $1.03 per share, more than 22%, to close on March 31, 2009, at $3.52 per share, on unusually heavy volume.

7.    Then, on June 25, 2009, the FDA announced that U.S. Marshals had seized drug

2

products manufactured by Caraco from the Company's facilities. According to the FDA, this action followed Caraco's continued failure to meet the FDA's current Good Manufacturing Practice ("cGMP") requirements, which assure the quality of manufactured drugs. The FDA stated that through the seizure, it sought to immediately stop the company from further distributing drugs until there is assurance that the firm complies with good manufacturing requirements.

8.      On this news, shares of Caraco declined $1.79 per share, approximately 43%, to close on June 25, 2009, at $2.39 per share, on unusually heavy volume.

9.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company failed to meet the FDA's cGMP requirements; (2) that the Company failed to take corrective measures in order to have its manufacturing facilities comply with the FDA's cGMP requirements; (3) that the Company had failed to remedy repeat violations of FDA regulations previously observed and documented by the FDA; (4) that the foregoing significantly jeopardized the Company's ability to gain FDA approval of pending new drug applications; and (5) that as a result of the above, the Company would have to recall certain products.

10.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §

240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District. Additionally, Caraco is a Michigan corporation and maintains its principal executive offices within this Judicial District.

14.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15.    Plaintiff Jonathan Wilkof, as set forth in the accompanying certification, incorporated by reference herein, purchased Caraco common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.    Defendant Caraco is a Michigan corporation and maintains its principal executive offices at 1150 Elijah McCoy Drive, Detroit, Michigan 48202.

17.    Defendant Daniel H. Movens ("Movens") was, at all relevant times, Chief Executive Officer ("CEO") and a director of Caraco.

4

18.     Defendant Mukul Rathi ("Rathi") was, at all relevant times, Interim Chief Financial Officer ("CFO") of Caraco.

19.     Defendants Movens and Rathi are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Caraco's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Caraco is engaged primarily in the business of developing, manufacturing, marketing and distributing generic and private-label pharmaceuticals to the nation's largest wholesalers, distributors, warehousing and non-warehousing chain drugstores and managed care providers, throughout the U.S. These products are intended to treat a variety of disorders including but not limited to the following: hypertension, arthritis, epilepsy, diabetes, antipsychotic, depression and

pain management.

**Materially False and Misleading**
**Statements Issued During the Class Period**

21.    The Class Period begins on May 29, 2008.  On this day, Caraco issued a press

release entitled, "Caraco Pharmaceutical Laboratories, Ltd. Reports Record Results for the Fourth

Quarter and Fiscal Year 2008."  Therein, the Company, in relevant part, stated:

> DETROIT, May 29 /PRNewswire-FirstCall/ -- Caraco Pharmaceutical Laboratories,
> Ltd. (Amex: CPD) posted record net sales for the fourth quarter and the year ended
> March 31, 2008 (Fiscal 2008), of $191.8 million and $350.4 million, respectively, as
> compared to $32.7 million and $117.0 million for the corresponding periods of Fiscal
> 2007. Net income grew to $11.5 million and $35.4 million for the fourth quarter and
> Fiscal 2008, respectively, as compared to net income of $9.5 million and $26.9
> million during the corresponding periods of Fiscal 2007. The annual net income of
> $35.4 million for Fiscal 2008 was a record for the Company.
>
> Daniel H. Movens, Caraco's Chief Executive Officer, said, "Our sales results for the
> fourth quarter are due in large part to the product launch of pantoprazole as part of
> our distribution and sale agreement with Sun Pharmaceutical Industries, Limited.
> (Sun Pharma) for Paragraph IV products. Due to the size of this launch, this level of
> sales may not be sustainable in the subsequent quarters. In Fiscal 2008, our continued
> top line growth was primarily due to increased marketing of products distributed on
> behalf of Sun Pharma along with continued growth in the Company's manufactured
> products. In Fiscal 2007, we entered into a definitive agreement to market Sun
> Pharma Abbreviated New Drug Applications (ANDAs) that are either approved or
> awaiting approval at the U.S. Food and Drug Administration (FDA). In addition, in
> Fiscal 2008, the Company entered into a three-year distribution and sale agreement
> with Sun Pharma to distribute Paragraph IV products that have been filed under the
> Paragraph IV certification process with the FDA. Sun Pharma is not required to offer
> Caraco products under these agreements, however, Caraco has the exclusive right to
> market any products offered by Sun Pharma and accepted by Caraco under these
> agreements."
>
> Mr. Movens added, "Pantoprazole, which was launched during the fourth quarter,
> and oxcarbazepine, which was launched during the third quarter, were the most
> recent significant drivers of our sales. Excluding oxcarbazepine and pantoprazole
> sales, our base business continued to experience growth throughout Fiscal 2008. We
> had gained seventeen new product approvals throughout the year of both Caraco and
> Sun Pharma products to complement our portfolio of existing products."

"Our strategy remains to grow the business appropriately by utilizing all of our diverse paths of development. The weight of distributed product sales has significantly increased during Fiscal 2008 due to recent launches, which will most likely continue on a short-term basis. Overall, we are pleased with the direction of the Company and our continued focus on executing Caraco's business plan is a major factor in the Company's success."

Fourth Quarter and Fiscal 2008 Results

During the fourth quarter and Fiscal 2008, net sales rose to a record $191.8 million and $350.4 million, respectively, from $32.7 million and $117.0 million for the corresponding periods of Fiscal 2007. Gross profit during the relevant periods improved to $27.5 million and $84.7 million, as compared to $15.4 million and $57.8 million for the corresponding periods of Fiscal 2007, reflecting an increase of 79% and 47%, respectively. The increase in gross profit was due to higher sales, primarily of distributed products, including new launches of Paragraph IV products, under the agreements with Sun Pharma.

The gross profit margin decreased to 24% in Fiscal 2008 from 49% in Fiscal 2007. The decrease was primarily due to the weight of increased sales of distributed products versus the sales of manufactured products, which had an impact on the overall margins. Net sales for distributed products during Fiscal 2008 were $225.1 million compared to $4.6 million for Fiscal 2007. The gross profit margin on other than Paragraph IV distributed products sold was 14% and 30% for Fiscal 2008 and Fiscal 2007, respectively. The current margins are near our expectations for other than Paragraph IV distributed products. Products that are part of the Paragraph IV distribution and sale agreement currently earn a gross profit margin of 8%. Net sales for manufactured products were $125.3 million during Fiscal 2008 compared to $112.4 million for Fiscal 2007. The gross profit margin for manufactured products was 49% for Fiscal 2008, as compared to 50% for Fiscal 2007.

Mr. Movens stated, "Manufactured product margins have remained fairly stable yet are slightly lower, primarily due to overall erosion in sales prices partially offset by sales of our product mix. We are hopeful that these margins continue as we manage, among other things, various factors such as changes in product sales mix, the balance of product sold to the various classes of trade, new product launches and continued price erosion. As anticipated, the distribution margins, as a percentage of sales, were in the mid-teens excluding Paragraph IV products. We can not determine the weight of distributed product sales versus manufactured product sales in any given period, as it depends on our ability to gain market share on each product, and is relative to when the FDA approves any given product in either category of product and the revenue potential of that product once it has been approved."

7

Selling, general and administrative (SG&A) expenses for the fourth quarter and Fiscal 2008 were $4.2 million and $14.3 million, respectively, compared to $2.8 million and $9.9 million for the corresponding periods of Fiscal 2007, representing an increase of 50% and 44% in the respective periods. The increase was mainly due to higher marketing and administrative efforts relative to the increase in sales. SG&A expenses, as a percentage of net sales improved to 4% for fiscal 2008, as compared to 8% for Fiscal 2007.

Total research and development (R&D) expenses for the fourth quarter and Fiscal year 2008 were $5.9 million and $29.7 million, respectively, as compared to $3.8 million and $22.4 million during the corresponding periods of Fiscal 2007. Actual cash R&D expenses were $5.9 million and $18.4 million for the fourth quarter and Fiscal 2008, as compared to $3.8 million and $10.6 million for the corresponding periods of Fiscal 2007. We incurred non-cash R&D expenses (technology transfer cost) of $11.3 million for the 1,088,000 shares of preferred stock for two product transfers during Fiscal 2008 as compared to $11.8 million for the 1,632,000 shares of preferred stock for three product transfers during Fiscal 2007. There were no non-cash R&D expenses during the fourth quarter of Fiscal 2008 or Fiscal 2007. The cash R&D expenses during Fiscal 2008 were higher compared to those during Fiscal 2007 primarily due to increased patent related expenses, increased R&D activity, including milestone payments for outside development and increases in other expenses in an effort to file additional products with the FDA. We filed eight ANDAs or seven products with the FDA during Fiscal 2008. This brings our total number of ANDAs pending approval by the FDA to 27 (including four tentative approvals) or 19 products.

Mr. Movens stated, "We generated cash from operations of $27.8 million during Fiscal 2008, compared to $27.9 million in Fiscal 2007. Our working capital continues to improve. At March 31, 2008, we had working capital of $104.5 million compared to working capital of $76.2 million at March 31, 2007. The increase in working capital in Fiscal 2008 is due to an increase in accounts receivable, an increase in inventory balances resulting from higher sales volumes, a build up of inventory for Paragraph IV products recently launched and an increase in prepaids due to an increase in a contractual deposit with a certain customer, partially offset by higher accounts payable balances related to the higher inventory levels. We believe inventory, though considerably higher than previous quarters are realizable. Additionally, we have available a $10.0 million line of credit obtained through JP Morgan Chase Bank, N.A. which would allow us flexibility in expansion efforts to increase our capacity over the next few years."

Mr. Movens said, "As we have previously disclosed, we have implemented development strategies with various third parties both domestic and abroad, in addition to the Sun Pharma products agreements that will complement both the

Caraco and Sun Pharma development pipeline. We also anticipate additional development agreements will be entered into in order to eliminate any future gaps in our calendar of approvals that we anticipate from the FDA. We expect these agreements to continue to remain key contributors to our business in addition to our own internal product development, which we continue to fortify by adding formulators to our own research and development team and increasing the number of products we have in development."

Mr. Movens stated, "Our expansion of our facilities should be completed prior to the end of calendar year 2008. This manufacturing facility along with our new distribution facility which we recently leased should provide the capacity we need to supply our customers effectively. Our training and succession planning is being enhanced to support our growth and predict future operational efficiencies. We are working with local universities and technical schools in order to provide the proper talented employees required to perform in a highly regulated business. This should create and solidify the pool of personnel required at all levels of the company to support our growth and provide careers for the local economy. We anticipate improved productivity as our staff continues to increase their experience in their respective positions."

"Our internal efforts, combined with Sun Pharma in developing new products have also picked up momentum and this should permit us to grow at the level of our guidance as provided below. Based on our current distribution and sale and marketing agreements with Sun Pharma and our internal portfolio of products and future approved products, we believe we will achieve 25% growth in sales for Fiscal 2009, compared to Fiscal 2008," added Mr. Movens

"The Company intends to aggressively move forward with the development of new products. While the development of new products will increase our cash R&D expense and impact EPS, we believe that we will continue to have the cash and other means available to meet increased working capital requirements, fund anticipated Paragraph IV certification litigation legal expenses, and finance further capital investments. Product development is a critical element in meeting expectations in the future," Mr. Movens concluded.

22.     On June 10, 2008, Caraco filed its Annual Report with the SEC on Form 10-K

for the 2008 fiscal fourth quarter and full year.  The Company's 10-K was signed by Defendant

Movens and reaffirmed the Company's financial results previously announced on May 29, 2008The

Company's 10-K also contained Sarbanes-Oxley required certifications, signed by Defendants

Movens and Rathi, who certified:

1.     I have reviewed this report on Form 10-K of the registrant;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.     Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

    (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during registrant's most recent fiscal quarter (registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to

materially affect, registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons fulfilling the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

23.  On July 25, 2008, Caraco issued a press release entitled, "Caraco Pharmaceutical Laboratories, Ltd. Reports Results for the First Quarter of Fiscal Year 2009." Therein, the Company, in relevant part, stated:

DETROIT, July 25 /PRNewswire-FirstCall/ -- Caraco Pharmaceutical Laboratories, Ltd. (Amex: CPD) posted net sales for the first quarter of Fiscal 2009, ended June 30, 2008, of $108.3 million, as compared to $35.4 million for the corresponding period of Fiscal 2008. This represents an increase of 206% over the first quarter of Fiscal 2008. Pre-tax income grew to $14.6 million for the first quarter of Fiscal 2009 as compared to a pre-tax income of $9.6 million during the corresponding period of Fiscal 2008, while net income increased by 11% to $9.4 million in the first quarter of Fiscal 2009, as compared to $8.5 million in the first quarter of Fiscal 2008.

Daniel H. Movens, Caraco's Chief Executive Officer, said, "Our sales results for the first quarter are primarily due to sales of distributed products launched by the Company during the fourth quarter of Fiscal 2008 under the distribution and sale agreement with Sun Pharma and, to a lesser extent, sales of other products launched in Fiscal 2008 under the marketing agreements with Sun Pharma as well as growth in sales of our own manufactured products."

Mr. Movens added, "Though distributed products launched in fourth quarter Fiscal 2008, remained a significant driver of our sales, first quarter Fiscal 2009 had solid growth on our overall product line over the corresponding period of Fiscal 2008. We continue to work towards improved market share of both new and existing products."

11

"Our strategy remains to grow the business appropriately by utilizing all of our diverse paths of development. During Fiscal 2008, the weight of distributed product sales significantly increased. This trend will most likely continue on a short-term basis. Overall, we are pleased with the direction of the Company and our continued focus on executing Caraco's business plan is a major factor in the Company's success."

First Quarter Fiscal 2009 Results

During the first quarter of Fiscal 2009, net sales were $108.3 million, as compared to $35.4 million for the corresponding period of Fiscal 2008. Gross profit during the first quarter of Fiscal 2009 improved to $23.6 million, as compared to $15.9 million for the corresponding period of Fiscal 2008, reflecting an increase of 48%. The increase in gross profit was due to higher sales, primarily of distributed products, including Paragraph IV products, under agreements with Sun Pharma.

The gross profit margin decreased as a percentage to 22% in the first quarter of Fiscal 2009 from 45% in the corresponding period of Fiscal 2008. The decrease was primarily due to the weight of increased sales of distributed products versus the sales of manufactured products, which had an impact on the overall margin percentage. Net sales for distributed products during the first quarter of Fiscal 2009 were $76.2 million compared to $7.0 million for the first quarter of Fiscal 2008. The gross profit margin was 9% for the first quarter of Fiscal 2009, as compared to 23% for the first quarter of Fiscal 2008. The decrease was primarily due to the weight of increased sales of Paragraph IV products versus the sales of other distributed products. Products that are part of the Paragraph IV distribution and sale agreement currently earn a gross profit margin of 8%. Paragraph IV certified products may face litigation challenges with respect to claims of patent infringement. Net sales for manufactured products were $32.0 million during the first quarter of Fiscal 2009, as compared to $28.4 million for the corresponding period of Fiscal 2008. The gross profit margin for manufactured products was 51% for the first quarter of Fiscal 2009, as compared to 50% for the first quarter of Fiscal 2008.

Mr. Movens stated, "Manufactured product margins have remained fairly stable, yet are slightly higher, primarily due to product sales mix. We are hopeful that these margins continue as we manage, among other things, various factors such as changes in product sales mix, the balance of product sold to the various classes of trade, new product launches and continued price erosion. We cannot determine the weight of distributed product sales versus manufactured product sales in any given period, as it depends on our ability to gain market share on each product, and is relative to when the FDA approves any given product in either category of product and the revenue potential of that product once it has been approved."

12

Selling, general and administrative ("SG&A") expenses during the first quarter of Fiscal 2009 were $3.8 million, as compared to $3.4 million during the corresponding period of Fiscal 2008, representing an increase of 12%. The increase was mainly related to higher marketing and administrative efforts relative to the increase in sales. SG&A expenses, as a percentage of net sales, improved to 4% for the first quarter of Fiscal 2009, as compared to 10% for the corresponding period of Fiscal 2008. The lower SG&A, as a percentage of sales, is primarily due to increased sales of distributed products.

Total R&D expenses for the first quarter of Fiscal 2009 were $5.5 million, as compared to $3.3 million during the corresponding period of Fiscal 2008. The Company did not incur any non-cash R&D expenses (technology transfer costs) during the first quarter of Fiscal 2009 or during the corresponding period of Fiscal 2008, as the final product was transferred to Caraco by Sun Global during the third quarter of Fiscal 2008, which concluded the obligations between the parties under a technology transfer agreement between Caraco and Sun Global. Cash R&D will continue to increase in an effort to develop and file additional products. The cash R&D expenses during the first quarter of Fiscal 2009 were higher compared to those during the corresponding period of Fiscal 2008 due to increased R&D activity, including increased patent related expenses and increases in other expenses in an effort to file more products with the FDA. We filed one New Drug Application ("NDA") relating to one product with the FDA during the first quarter of Fiscal 2009. We have received FDA approval for eight ANDAs relating to three products during the first quarter of Fiscal 2009. This brings our total number of ANDAs pending approval by the FDA to 19 (including four tentative approvals) relating to 16 products and one NDA pending approval.

Mr. Movens said, "As we have previously disclosed, we have implemented development strategies with various third parties both domestic and abroad, in addition to the Sun Pharma products agreements that will complement both the Caraco and Sun Pharma development pipeline. We also anticipate additional development agreements will be entered into in order to eliminate any future gaps in our calendar of approvals that we anticipate from the FDA. We expect these agreements to remain key future contributors to our business in addition to our own internal product development. We continue to fortify our internal development by adding formulators to our research and development team and increasing the number of products we have in development. We are pleased that we have filed our first NDA during the period."

Mr. Movens stated, "The expansion of our facilities should be completed prior to the end of Fiscal 2009. This manufacturing facility along with our new distribution facility, which we recently leased, should provide the capacity we need to supply our customers effectively. Our training and succession planning is being enhanced to

support our growth and predict future operational efficiencies. We are working with local universities and technical schools in order to provide the proper talented employees required to perform in a highly regulated business. This should create and solidify the pool of personnel required at all levels of the Company to support our growth and provide careers for the local economy. We anticipate improved productivity as our staff continues to increase their experience in their respective positions."

"Our internal efforts, combined with Sun Pharma, in developing new products have also picked up momentum and this should permit us to grow at the level of our guidance as provided below. Based on our current distribution and sale and marketing agreements with Sun Pharma and our internal portfolio of products and future approved products, we believe we will achieve 25% growth in sales for Fiscal 2009, compared to Fiscal 2008," added Mr. Movens.

"The Company intends to aggressively move forward with the development of new products. While the development of new products will increase our cash R&D expense and impact EPS, we believe that we will continue to have the cash and other means available to meet increased working capital requirements, fund anticipated Paragraph IV certification litigation legal expenses, and finance further capital investments. Product development is a critical element in meeting future expectations," Mr. Movens concluded.

24.    On July 25, 2008, Caraco filed its Quarterly Report with the SEC on Form 10-Q for the 2009 fiscal first quarter. The Company's 10-Q was signed by Defendants Movens and Rathi, and reaffirmed the Company's financial results previously announced on July 25, 2008. The Company's 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Movens and Rathi, substantially similar to the certifications contained in ¶22, *supra*.

25.    On October 23, 2008, Caraco issued a press release entitled, "Caraco Pharmaceutical Laboratories, Ltd. Reports Results for the Second Quarter and First Six Months of Fiscal 2009." Therein, the Company, in relevant part, stated:

DETROIT, Oct. 23 /PRNewswire-FirstCall/ -- Caraco Pharmaceutical Laboratories, Ltd. (Amex: CPD) posted net sales for the second quarter and first six months of Fiscal 2009 of $122.2 million and $230.5 million, respectively, as compared to $41.4 million and $76.8 million, respectively, for the corresponding periods of Fiscal 2008.

14

This represents increases of 195% and 200% over the respective periods of Fiscal 2008. Pre-tax income grew to $12.3 million for the second quarter and $26.9 million for the first six months of Fiscal 2009 as compared to pre-tax income of $4.9 million and $14.5 million, respectively, during the corresponding periods of Fiscal 2008, while net income increased by 82% to $8.4 million in the second quarter of Fiscal 2009, as compared to $4.6 million in the second quarter of Fiscal 2008 and increased to $17.9 million for the first six months of Fiscal 2009, compared to $13.1 million for the corresponding period of Fiscal 2008, an increase of 36%.

Daniel H. Movens, Caraco's Chief Executive Officer, said, "Our sales results for the second quarter are primarily due to sales of distributed products by the Company under the distribution and sale agreement with Sun Pharma, and to a lesser extent, sales of other products launched in Fiscal 2008 under the marketing agreements with Sun Pharma as well as growth in sales of our own manufactured products."

Mr. Movens added, "Though distributed products launched in the fourth quarter Fiscal 2008 remained a significant driver of our sales, second quarter Fiscal 2009 had solid growth on our overall product line over the corresponding period of Fiscal 2008. We continue to make inroads towards improved market share of both new and existing products while we work to maintain our current market share on what is now becoming a broader basket of products in our portfolio."

"Our strategy remains to grow the business effectively by maximizing our sales on our approved products born out of our various paths of development. Towards the end of Fiscal 2008, the weight of distributed product sales significantly increased. This trend has continued through the first six months of Fiscal 2009 and will most likely continue on a short-term basis. Overall, we are pleased with the direction of the Company and our continued focus on executing Caraco's business plan is a major factor in the Company's success."

Second Quarter and First Six Months Fiscal 2009 Results

During the second quarter and first six months of Fiscal 2009, net sales were $122.2 million and $230.5 million, respectively, as compared to $41.4 million and $76.8 million, respectively, for the corresponding periods of Fiscal 2008. Gross profit during the second quarter and first six months of Fiscal 2009 improved to $22.0 million and $45.6 million, respectively, as compared to $18.0 million and $33.9 million, respectively, for the corresponding periods of Fiscal 2008, reflecting increases of 22% and 35%, respectively. The increases in gross profit were due to higher sales, primarily of distributed products, including Paragraph IV products, under agreements with Sun Pharma.

The gross profit margin as a percentage of net sales for the second quarter and first

15

six months of Fiscal 2009 decreased to 18% and 20%, respectively, as compared to 44% during both of the corresponding periods of Fiscal 2008. The decreases were primarily due to the weight of increased sales of distributed products versus the sales of manufactured products, which had an impact on the overall margin percentage. Net sales for distributed products during the second quarter and first six months of Fiscal 2009 were $89.9 million and $166.2 million, respectively, as compared to $6.4 million and $13.4 million, respectively, for the corresponding periods of Fiscal 2008. The gross profit margin for distributed products for the second quarter and first six months of Fiscal 2009 was 7% and 8%, respectively, as compared to 17% and 20%, respectively, for the corresponding periods of Fiscal 2008. The decreases were primarily due to the weight of increased sales of Para IV products, which earn lower margins as a percentage of sales versus the sale of other distributed products. Net sales for manufactured products were $32.2 million and $64.3 million, respectively, during the second quarter and first six months of Fiscal 2009 as compared to $34.9 million and $63.3 million, respectively, for the corresponding periods of Fiscal 2008. The gross profit margin for manufactured products was 48% and 49%, respectively, for the second quarter and first six months of Fiscal 2009, in line with the second quarter and first six months of Fiscal 2008.

Mr. Movens stated, "Manufactured product margins have remained fairly stable period to period. This rate may or may not remain at current levels in future periods. To date we have had constant downward pricing pressure. We are hopeful that manufactured margins remain in line with Fiscal 2008 as we continue to manage, among other things, various factors such as changes in product sales mix, the balance of product sold to the various classes of trade, price erosion, new competitors entering the market and protecting and growing our market share. We can not determine the mix of distributed product sales versus manufactured product sales in any given period as it depends on our ability to gain market share on each product and is relative to when the FDA approves any given product in either category of product and the revenue potential of that product once it has been approved."

Selling, general and administrative ("SG&A") expenses during the second quarter and first six months of Fiscal 2009 were $4.2 million and $8.1 million, respectively, as compared to $3.0 million and $6.4 million, respectively, during the corresponding periods of Fiscal 2008. The increases were mainly related to higher marketing and administrative efforts relative to the increase in sales.

Total R&D expenses for the second quarter and first six months of Fiscal 2009 were $5.6 million and $11.1 million, respectively, as compared to $10.5 million and $13.8 million, respectively, during the corresponding periods of Fiscal 2008. The Company did not incur any non-cash R&D expenses (technology transfer costs) during the second quarter or first six months of Fiscal 2009, as compared to $5.4 million incurred for both of the corresponding periods of Fiscal 2008. The final product was

transferred to Caraco by Sun Pharma Global Inc. during the third quarter of Fiscal 2008, which concluded the obligations between the parties under a technology transfer agreement between Caraco and Sun Global. Cash R&D will continue to increase in an effort to develop and file additional products. We filed four Abbreviated New Drug Applications ("ANDAs") relating to three products with the FDA during the second quarter of Fiscal 2009. This brings our total number of ANDAs pending approval by the FDA to 23 (including four tentative approvals) relating to 19 products and one NDA pending approval.

Mr. Movens said, "As we have previously disclosed, we have implemented development strategies with various third parties both domestic and abroad, in addition to the Sun Pharma products agreements that are intended to complement both the Caraco and Sun Pharma development pipeline. We also anticipate additional development agreements will be entered into in order to eliminate any future gaps in our calendar of approvals that we anticipate from the FDA. We expect these agreements to remain key future contributors to our business in addition to our own internal product development. We continue to fortify our internal development by adding formulators to our research and development team and increasing the number of products we have in development."

Mr. Movens stated, "The expansion of our facilities should be completed prior to the end of Fiscal 2009. The manufacturing facility that we are building, along with our new distribution facility which we recently leased, should provide the capacity we need to supply our customers effectively. Our training and succession planning is being enhanced to support our growth and predict future operational efficiencies and improved outcome in quality. We continue to work in collaboration with the State of Michigan and the City of Detroit in conjunction with local universities and technical schools in order to provide the proper talented employees. This should allow us to perform well in what is a highly regulated business. This should also create and solidify the pool of personnel required at all levels of the Company to support our growth and provide careers for the local economy. We anticipate improved productivity as our staff continues to increase their experience in their respective positions."

"Our internal efforts, combined with Sun Pharma, in developing new products continue to pick up momentum and should permit us to grow at the level of our guidance. The current level of growth is at a high level which may not be sustainable. Based on our current distribution and sale and marketing agreements with Sun Pharma and our internal portfolio of products and future approved products, we believe we will achieve 25% growth in sales for Fiscal 2009, compared to Fiscal 2008," added Mr. Movens.

Mr. Movens stated, "The Company intends to aggressively move forward with the

development of new products. We believe that R&D remains to be a significant driver of future growth. While the development of new products will continue to impact our cash R&D expense and EPS, we believe that we will continue to have the cash and other means available to meet increased working capital requirements, fund anticipated Paragraph IV certification litigation legal expenses, and finance further capital investments. Product development is a critical element in meeting future expectations."

"We are pleased with our overall results and the direction of the company. We look towards building on our manufacturing sales where possible while measuring the balance required to optimize our gross profit on both distributed and manufactured products. We have many projects in place that should result in improved efficiencies and productivity both from a systems and operational perspective. We will continue to work at lowering costs while maintaining quality throughput in production. As we work through reviewing various target acquisition opportunities that come available to us we may determine that we need additional cash to complete a particular acquisition. Though this could result in future borrowings, we currently remain debt free," Mr. Movens concluded.

26.    On October 24, 2008, Caraco filed its Quarterly Report with the SEC on Form 10-Q for the 2009 fiscal second quarter. The Company's 10-Q was signed by Defendants Movens and Rathi, and reaffirmed the Company's financial results previously announced on October 23, 2008. The Company's 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Movens and Rathi, substantially similar to the certifications contained in ¶22, *supra*.

27.    The statements contained in ¶¶21-26 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company failed to meet the FDA's cGMP requirements; (2) that the Company failed to take corrective measures in order to have its manufacturing facilities comply with the FDA's cGMP requirements; (3) that the Company had failed to remedy repeat violations of FDA regulations previously observed and documented by the FDA; (4) that the foregoing significantly jeopardized the Company's ability to gain FDA approval of pending new drug applications; and (5) that as a result of the above, the

18

Company would have to recall certain products.

### The Truth Begins to Emerge

28.    On November 3, 2008, Caraco issued a press release entitled, "Caraco

Pharmaceutical Laboratories, Ltd. Receives FDA Warning Letter."  Therein, the Company, in

relevant part, stated:

> DETROIT, Nov. 3 /PRNewswire-FirstCall/ -- On October 31, 2008, Caraco
> Pharmaceutical Laboratories, Ltd. (NYSE Alternext US: CPD) received a warning
> letter from the FDA. The letter was issued as a follow up to the last FDA inspection
> of the Company's manufacturing facility in Detroit, Michigan which was initiated in
> May 2008. As previously disclosed, a Form 483 notice was issued in June 2008
> following this inspection. The Company had responded to all the observations made
> in the Form 483 within thirty days thereof, and corrective actions were taken and
> substantially completed. Subsequent letters noting additional improvements were
> also provided to the FDA similar to what the Company has done in previous
> correspondence with the FDA. The observations set forth in the warning letter
> include, among other things, the inadequate and untimely investigation by the quality
> control unit of certain incidents at the facility contrary to the Company's standard
> operating procedures. The FDA considered some of its observations to be repeat
> observations. The Company believes that the full warning letter, listing all of the
> observations, will be posted by the FDA shortly on its website at www.fda.gov .
>
> Until the Company's responses to the observations have been clarified and
> explanations provided to the satisfaction of the FDA, the FDA may in the near term
> withhold approval of pending new drug applications listing the facility as the
> manufacturer.
>
> Caraco intends to respond promptly and timely to the FDA within fifteen business
> days. The Company is committed to working cooperatively and expeditiously with
> the FDA to resolve the matters indicated in its letter. Caraco is confident that any
> remaining concerns will be addressed and resolved.

29.    On this news, over the next three days, shares of Caraco declined by $2.26 per share,

or 22.22%, to close on November 5, 2008, at $7.91 per share, on unusually heavy volume.

30.    On November 21, 2008, Caraco issued a press release entitled, "Caraco

Pharmaceutical Laboratories, Ltd. Update on FDA Warning Letter."  Therein, the Company, in

relevant part, stated:

> DETROIT, Nov 21, 2008 /PRNewswire-FirstCall via COMTEX News Network/ --
> Caraco Pharmaceutical Laboratories, Ltd. (NYSE Alternext US: CPD) announced
> today that it will be filing its response to the FDA warning letter on November 24,
> 2008 as planned. In the warning letter, received on October 31, 2008, the FDA
> requested a response from Caraco within 15 business days, ending November 24,
> 2008.
>
> As previously disclosed, the warning letter was issued as a follow up to the last FDA
> inspection of the Company's manufacturing facility in Detroit, Michigan which was
> initiated in May 2008. Until the Company's responses to the observations have been
> clarified and explanations provided to the satisfaction of the FDA, the FDA may in
> the near term withhold approval of pending new drug applications listing the facility
> as the manufacturer. The Company's sales of current products continue in the normal
> course of business.
>
> The Company is committed to working cooperatively and expeditiously with the
> FDA to resolve the matters indicated in its letter.

31.    On November 24, 2008, Caraco issued a press release entitled, "Caraco

Pharmaceutical Laboratories, Ltd. Responds to FDA Warning Letter." Therein, the Company, in

relevant part, stated:

> DETROIT, Nov. 24 /PRNewswire-FirstCall/ -- Caraco Pharmaceutical Laboratories,
> Ltd. (NYSE Alternext US: CPD) announced today that it has timely submitted its
> response to the FDA warning letter that was received on October 31, 2008. In the
> warning letter, the FDA requested a response from Caraco within 15 business days,
> ending November 24, 2008.
>
> As previously disclosed, the warning letter was issued as a follow up to the last FDA
> inspection of the Company's manufacturing facility in Detroit, Michigan which was
> initiated in May 2008. Until the Company's responses to the observations have been
> clarified and explanations provided to the satisfaction of the FDA, the FDA may in
> the near term withhold approval of pending new drug applications listing the facility
> as the manufacturer. The Company's sales of current products continue in the normal
> course of business.
>
> The Company is committed to working cooperatively and expeditiously with the
> FDA to resolve the matters indicated in its letter. The Company has requested a
> meeting with the FDA as a follow up to its response. Caraco believes it has addressed

the concerns in the warning letter appropriately.

32.    On January 29, 2009, Caraco issued a press release entitled, "Caraco Pharmaceutical Laboratories, Ltd. Reports Results for the Third Quarter and First Nine Months of Fiscal 2009." Therein, the Company, in relevant part, stated:

> DETROIT, Jan. 29 /PRNewswire-FirstCall/ -- Caraco Pharmaceutical Laboratories, Ltd. (NYSE Alternext US: CPD) posted net sales for the third quarter ended December 31, 2008 and first nine months of Fiscal 2009 of $55.7 million and $286.2 million, respectively, as compared to $81.9 million and $158.6 million, respectively, for the third quarter and first nine months of Fiscal 2008, reflecting a decrease of 32% in the third quarter of Fiscal 2009 and an increase of 80% in the first nine months of Fiscal 2009, as compared to the corresponding periods of Fiscal 2008. The Company earned a net pre-tax income of $6.5 million and $33.4 million, respectively, during the third quarter and first nine months of Fiscal 2009, as compared to a net pre-tax income of $10.1 million and $24.6 million during the corresponding periods of Fiscal 2008. Caraco earned net income of $5.1 million and $22.9 million, respectively, for the third quarter and first nine months of Fiscal 2009, compared to net income of $10.8 million and $23.9 million, respectively, for the corresponding periods of Fiscal 2008.
>
> Daniel H. Movens, Caraco's Chief Executive Officer, said, "The sales decline in third quarter Fiscal 2009 was primarily due to sales of one product (oxcarbazepine), launched under our marketing agreement with Sun Pharmaceutical Industries Limited during the third quarter of Fiscal 2008. The sales in third quarter Fiscal 2008 were significantly higher than current sales during the third quarter of Fiscal 2009 since this product enjoyed 180 days shared exclusivity in Fiscal 2008, which allowed its higher sales. Subsequent to the end of the exclusivity period, which occurred during the first quarter of Fiscal 2009, the net realizations for this product have decreased significantly as several other competitors have entered the market for this generic product. The increase in the first nine months of Fiscal 2009 of 80% is primarily due to sales of pantoprazole partially offset by the reduction in oxcarbazepine sales."
>
> Third Quarter and First Nine Months Fiscal 2009 Results
>
> Net sales for the third quarter ended December 31, 2008 and first nine months of Fiscal 2009 were $55.7 million and $286.2 million, respectively, as compared to $81.9 million and $158.6 million, respectively, for the third quarter and first nine months of Fiscal 2008, reflecting a decrease of 32% in the third quarter of Fiscal 2009 and an increase of 80% in the first nine months of Fiscal 2009, as compared to the corresponding periods of Fiscal 2008. The decrease in net sales for the third

quarter of Fiscal 2009, as compared to the corresponding period of Fiscal 2008 is primarily due to lower sales of distributed products by the Company under the marketing agreement with Sun Pharma, and to a lesser extent, sales of manufactured products. Also as previously disclosed, the sales of Para IV products being marketed under the distribution and sales agreement may not be sustainable. A significant decrease on the sale of a Para IV product (pantoprazole) contributed to the lower sales in third quarter Fiscal 2009 as compared to first two quarters of Fiscal 2009.

Mr. Movens added, "Though the first nine months of Fiscal 2009 reflects growth of 80% over the corresponding period of Fiscal 2008, we believe that full-year Fiscal 2009 sales will be in line with level achieved during Fiscal 2008. This is based primarily on the reduction in sales on pantoprazole, and to a lesser extent our manufactured product sales. We have not taken any specific position on projected pantoprazole sales at this time. This product was launched at risk as part of our distribution and sale agreement with Sun Pharma. This product remains under litigation. We will continue to assess our level of risk that we are comfortable with and once we cross that threshold, we will have to weigh our options."

The gross profit margin as a percentage of net sales for the third quarter and first nine months of Fiscal 2009 was 29% and 21%, respectively, as compared to 28% and 36%, respectively, during the corresponding periods of Fiscal 2008. The decrease in the nine month period margin was primarily due to the weight of increased sales of distributed products versus the sales of manufactured products, which had an impact on the overall margins. The gross profit margin on distributed products was 10% and 9%, respectively, for the third quarter and first nine months of Fiscal 2009, as compared to 15% and 16%, respectively, for the corresponding periods of Fiscal 2008. The decrease was primarily due to the weight of increased sales of Para IV products, which earn lower margins as a percentage of sales versus the sale of other distributed products. The gross profit margin for manufactured products was 45% and 48%, respectively, for the third quarter and first nine months of Fiscal 2009, as compared to 49% for both of the corresponding periods of Fiscal 2008. Manufactured product margins have remained fairly stable during the Fiscal 2009 nine-month period. For the third quarter of Fiscal 2009, the overall gross profit margin for manufactured products was lower due to price erosion on certain products that faced new competition, as well as the change in customer mix. These rates may, or may not, remain at current levels in future periods.

Mr. Movens stated, "We are hopeful that manufactured margins remain in line with Fiscal 2008 as we continue to manage, among other things, various factors such as changes in product sales mix, the balance of product sold to the various classes of trade, price erosion, new competitors entering the market and protecting and growing our market share. We can not determine the mix of distributed product sales versus manufactured product sales in any given period as it depends on our ability to gain

market share on each product and is relative to when the FDA approves any given product in either category of product and the revenue potential of that product once it has been approved."

Selling, general and administrative ("SG&A") expenses during the third quarter and first nine months of Fiscal 2009 were $3.7 million and $11.8 million, respectively, as compared to $3.7 million and $10.2 million, respectively, during the corresponding periods of Fiscal 2008, representing no change in the third quarter of Fiscal 2009 as compared to corresponding period of Fiscal 2008 and an increase of 16% in the first nine months of Fiscal 2009 versus the same period of Fiscal 2008. The increase in the nine-month period was mainly related to higher marketing and administrative efforts relative to the increase in sales.

Total R&D expenses for the third quarter and first nine months of Fiscal 2009 were $5.8 million and $16.9 million, respectively, as compared to $10.0 million and $23.8 million, respectively, during the corresponding periods of Fiscal 2008. The Company did not incur any non-cash R&D expenses (technology transfer costs) during the third quarter or first nine months of Fiscal 2009, as compared to $5.9 million and $11.3 million, respectively, for the corresponding periods of Fiscal 2008. The cash R&D expenses during the first nine months of Fiscal 2009 were higher compared to those during the corresponding period of Fiscal 2008 due to increased R&D activity, including increased patent related expenses and increases in other expenses in an effort to file more products with the FDA. The Company filed six Abbreviated New Drug Applications ("ANDAs"), relating to five products, with the FDA during the first nine months of Fiscal 2009. Caraco has received FDA approval for eight ANDAs, relating to three products during the first nine months of Fiscal 2009. This brings the Company's total number of ANDAs pending approval by the FDA to 25 (including four tentative approvals), relating to 21 products. We need to continue to improve our output on research and development by filing more ANDAs with the FDA so as to increase our own manufactured products portfolio. It is our intention to do so both internally and by utilizing third party developers.

Mr. Movens said, "The Company intends to aggressively move forward with the development of new products. We believe we will file additional products with the FDA before the end of Fiscal 2009. In addition to the Sun Pharma products agreement, we have implemented additional development strategies with various third parties, both domestically and abroad, that are intended to complement the Sun Pharma development pipeline. We anticipate additional development agreements will be entered into in order to eliminate any future gaps in our calendar of approvals that we anticipate from the FDA. We expect these agreements to run parallel to our own internal product development. In order to improve the amount of filings, we continue to fortify our own research and development team by adding formulators and increasing the number of products we have in development internally. We continue

to be on track in our development expectations and subsequent filings."

We generated cash from operations in the amount of $0.2 million during the first nine months of Fiscal 2009, as compared to generating cash from operations of $24.3 million during the corresponding period of Fiscal 2008. The decrease in cash flows from operations was primarily due to a decrease in accounts payable balances offset, in part, by decreases in accounts receivable and inventory balances. At December 31, 2008, we had working capital of $104.4 million, compared to working capital of $104.5 million at March 31, 2008. Although the Company generated negative cash flows from operations in the first quarter of Fiscal 2009 in the amount of $27.4 million, the cash provided from operations during the second and third quarters of Fiscal 2009 were $19.2 million and $8.2 million, respectively. The Company's cash and cash equivalents balance was $34.0 million at December 31, 2008. Additionally, the Company has available a $10.0 million line of credit obtained through JP Morgan Chase Bank, N.A. Currently the credit line has no outstanding balances. The Company believes that its cash flows from operations will continue to support its business requirements. Further, during the first nine months of Fiscal 2009, the Company expended $21.7 million in purchases of property, plant and equipment, primarily to self-fund the expansion of its primary facility located in Detroit, Michigan. As of December 31, 2008, the expansion of this facility is nearing completion, and the Company believes that cash disbursements for capital expansions will decline significantly.

Mr. Movens stated, "The expansion of our facilities should provide us the capacity we need to supply our customers effectively. We are currently working on streamlining our procedures by adding improved systems and processes which should provide a quality output. Our training and succession planning is being enhanced both internally and by utilizing third parties, to support our growth and predict future operational efficiencies, and improved outcome in quality. We continue to work with local governments, universities and technical schools in order to provide the proper talented employees required to perform in a highly regulated business. We anticipate improved productivity and quality as our newer staff continues to increase their experience in their respective positions."

"With our planned expansion during Fiscal 2009, it remains important to have the proper management team in place to support the anticipated improvements and growth. Our production capacity and output needs to be increased in order to maximize sales throughout the remainder of Fiscal 2009 and beyond. Though we may decide to incur debt for target acquisitions or other business propositions, we currently remain free of any debt," Mr. Movens added.

On October 31, 2008, the Company received a warning letter from the Detroit District of the FDA. In this letter, the Agency reiterated some of the concerns detailed

in the previous Form 483 issued as a result of our inspection that concluded in June 2008. These concerns included inadequate and untimely investigations by our quality control unit of certain incidents contrary to the Company's standard operating procedures. The FDA also commented on our corrective action plans. The FDA added that failure to promptly correct the deficiencies may result in legal action without further notice, including, without limitation, seizure and injunction. It also noted that other federal agencies may take this warning letter into account when considering the award of contracts. Additionally, the FDA may withhold approval of requests for export certificates, or approval of pending new drug applications. We promptly responded to the warning letter on November 24, 2008 for the deficiencies noted and provided our corrective actions. The Detroit District acknowledged our response on December 22, 2008. It noted that our corrective actions will be evaluated during the FDA's next scheduled inspection of our Detroit facility. It is unlikely that we will receive any approvals for products out of our Detroit facility until after our next inspection. At this time, no further meetings were deemed necessary by the FDA. We have changed our leadership in both manufacturing and quality control in order to better align these areas with our corporate goals.

"We believe we are substantially compliant with cGMP. We have corrective actions in place and continue to work to improve our quality system. It is our intention to be a model of compliance at all times. We remain confident in our action plan. We continue to invest in improved systems, equipment, training and personnel in quality and manufacturing to improve our overall performance in quality and production. In the last two years we have added a considerable amount of infrastructure in our quality control laboratories. Our current focus is on manufacturing and quality assurance. The Company's sales of current products continue in the normal course of business. We continue to add products to our portfolio through Sun Pharma and its affiliates that we will launch into the US," Mr. Movens concluded.

33.    On February 3, 2009, Caraco filed its Quarterly Report with the SEC on Form10-Q for the 2009 fiscal third quarter. The Company's 10-Q was signed by Defendants Movens and Rathi, and reaffirmed the Company's financial results previously announced on January 29, 2009. The Company's 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Movens and Rathi, substantially similar to the certifications contained in ¶22, *supra*.

34.    On March 31, 2009, Caraco issued a press release entitled, "Caraco Pharmaceutical Laboratories, Ltd. Announces a Nationwide Voluntary Recall of All Lots of Digoxin Tablets Due

to Size Variability." Therein, the Company, in relevant part, stated:

> DETROIT, March 31 /PRNewswire-FirstCall/ -- Caraco Pharmaceutical Laboratories, Ltd. (NYSE Amex: CPD), a generic pharmaceutical company, announced today that all tablets of Caraco brand Digoxin, USP, 0.125 mg, and Digoxin, USP, 0.25 mg, distributed prior to March 31, 2009, which are not expired and are within the expiration date of September, 2011, are being voluntarily recalled to the consumer level. The tablets are being recalled because they may differ in size and therefore could have more or less of the active ingredient, digoxin. The recalled tablets were manufactured by Caraco Pharmaceutical Laboratories, Ltd. This recall is being conducted with the knowledge of the Food and Drug Administration.
>
> Digoxin is a drug product used to treat heart failure and abnormal heart rhythms. It has a narrow therapeutic index and the existence of higher than labeled dose may pose a risk of digoxin toxicity in patients with renal failure. Digoxin toxicity can cause nausea, vomiting, dizziness, low blood pressure, cardiac instability, and bradycardia. Death can also result from excessive digoxin intake. A lower than labeled dose may pose a risk of lack of efficacy potentially resulting in cardiac instability. Consequently, as a precautionary measure, Caraco is recalling these tablets to the consumer level to minimize any potential risk to patients.

35.     On this news, shares of Caraco declined $1.03 per share, or 22.64%, to close on

March 31, 2009, at $3.52 per share, on unusually heavy volume.

36.     On April 21, 2009, Caraco filed a Current Report with the SEC on Form 8-K.

Therein, the Company, in relevant part, stated:

> On April 17, 2009, as a precautionary measure, Caraco Pharmaceutical Laboratories, Ltd. ("Caraco") voluntarily initiated a recall of certain product lots manufactured in its Detroit, MI facility. This recall is primarily to the wholesale level. Caraco believes that the sales revenue of the affected lots is approximately $3 million. The recall is being conducted with the knowledge of the Food and Drug Administration.
>
> This recall does not impact other products currently produced and distributed by Caraco. Caraco remains committed to continually improving product quality and manufacturing operations at its Detroit facility.

37.     On May 28, 2009, Caraco issued a press release entitled, "Caraco Pharmaceutical

Laboratories, Ltd. Reports Results for the Fiscal Year 2009, Updates on FDA Inspection." Therein,

the Company, in relevant part, stated:

DETROIT, May 28 /PRNewswire-FirstCall/ -- Caraco Pharmaceutical Laboratories, Ltd. (NYSE Amex: CPD) recorded net sales of $337.2 million during Fiscal 2009 compared to $350.4 million during Fiscal 2008. We earned a net pre-tax income of $29.5 million during Fiscal 2009 compared to a net pre-tax income of $42.4 million during Fiscal 2008.

Daniel H. Movens, Caraco's Chief Executive Officer said, "The net sales for fiscal years 2009 and 2008 were $337.2 and $350.4 million, respectively, reflecting a decrease of 4%. The decrease was primarily due to lower sales of our own manufactured products sales, price erosion in both manufactured and distributed product sales and on account of our voluntary product recall initiated during late Fiscal 2009 and the beginning of Fiscal 2010."

We earned a gross profit of $67.8 million in Fiscal 2009, as compared to a gross profit of $84.7 million during Fiscal 2008, reflecting a decrease of 20%. The decrease in gross profit was primarily due to the weight of distributed product sales versus manufactured product sales, price erosion on both distributed and manufactured product sales as well as lower sales of our own manufactured products primarily due from our recent voluntary product recalls. "Although gross profit margins may come down over time due to price erosion, we are confident that our sales growth, expanding product portfolio and successful execution of our business plan will offset any long-term impact," Mr. Movens said.

Total R&D expenses were $22.5 million for Fiscal 2009 and $29.7 million for Fiscal 2008. In Fiscal 2009, all R&D expenses represented cash R&D expenses, while cash R&D expenses were $18.4 million for Fiscal 2008. The cash R&D expenses during Fiscal 2009 were higher compared to those during Fiscal 2008 primarily due to increased patent related expenses, increased R&D activity, and increases in other expenses in an effort to file additional products with the FDA. We filed ten Abbreviated New Drug Applications ("ANDAs") relating to nine products with the FDA during Fiscal 2009 as compared to seven products filed in 2008. This brings our total number of ANDAs pending approval by the FDA to 29 (including four tentative approvals) relating to 25 products. We also submitted ten other various filings with the FDA including those related to new sources on the Active Pharmaceutical Ingredients and alternative manufacturing sites in order to improve our costs on certain products.

We earned a net pre-tax income of $29.5 million in Fiscal 2009, compared to a net pre-tax income of $42.4 million in Fiscal 2008. The reduction in net pre-tax income from last year was primarily due to lower gross profits resulting from price erosion of the products sold, the mix of distributed products sold and the provision for losses

expected from the product recalls initiated during the end of Fiscal 2009 and beginning of Fiscal 2010. Net income decreased to $20.5 million during Fiscal 2009 from net income of $35.4 million during the Fiscal 2008.

Mr. Movens stated, "On March 11, 2009 the FDA began an inspection as a follow-up to the October, 2008 Warning Letter. This inspection covers all of the Company's quality and production systems. The inspection concluded on May 12, 2009. The FDA investigators provided the Company with a list of their observations on FDA Form 483. The Company has committed to provide a written response to these observations within 30 days. It is unlikely that we will receive any approvals for any new products out of our Detroit facility until the FDA reviews our remediation response and makes a determination of our status. Currently our status remains unchanged. In January 2009 we changed our leadership in both manufacturing and quality control in order to better align these areas with our corporate goals and have taken other steps to improve cGMP compliance and quality system. It should be noted that there were no deficiencies identified during the FDA inspection in the Quality Control Laboratory which supports and tests all of our products before they are released to the market."

Mr. Movens added, "We continue to attract and hire talented individuals, to improve our operation and we continue to improve both our service levels and expand our customer base where possible. Based on our own development pipeline and the current agreements we have with Sun Pharma along with other third party developers, we believe we will continue to perform well in our industry. Though we remain hopeful, the uncertainty of the timelines associated with new approvals based on our status with the FDA limits our view on our growth in the near term. Since FDA approvals are a significant part of any generic company's growth we have determined that we will not provide any further guidance related to our top line growth. We remain confident that our basic fundamental performance over the course of Fiscal 2010 will provide sufficient disclosure to our shareholders. The recent voluntary recalls previously disclosed have had a negative impact on the Company's performance and may continue to have a negative impact in the near term. Price erosion on both manufactured and distributed products also contributed to the decline of our top line growth. We remain confident that our corrective actions in compliance and quality will ultimately let us gain back our momentum of growth that we have enjoyed over the last several years. We are fortunate to have a successful marketing platform and Sun Pharmaceutical Industries Inc.'s product line to complement our manufacturing products business."

38.     On June 15, 2009, Caraco filed its Annual Report with the SEC on Form10-K

for the 2009 fiscal fourth quarter and full year.  The Company's 10-K was signed by Defendant

Movens and reaffirmed the Company's financial results previously announced on May 28, 2009. The Company's 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Movens and Rathi, substantially similar to the certifications contained in ¶22, *supra.*

39.    The statements contained in  ¶¶28, 30-34, 36-38 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company failed to meet the FDA's cGMP requirements; (2) that the Company failed to take corrective measures in order to have its manufacturing facilities comply with the FDA's cGMP requirements; (3) that the Company had failed to remedy repeat violations of FDA regulations previously observed and documented by the FDA; (4) that the foregoing significantly jeopardized the Company's ability to gain FDA approval of pending new drug applications; and (5) that as a result of the above, the Company would have to recall certain products.

### Events at the End of the Class Period

40.    On June 25, 2009, the market was shocked by news reports that federal agents had raided the Company's Michigan facilities and seized products manufactured by the Company, including ingredients used by the Company in manufacturing its products.  That day, the FDA issued a press release entitled, "U.S. Marshals Seize Drug Products Manufactured by Caraco Pharmaceutical Laboratories Ltd." Therein, the FDA, in relevant part, stated:

> ***FDA acts to prevent repeated drug quality problems***
>
> U.S. Marshals, at the request of the Food and Drug Administration, today seized drug products manufactured by Caraco Pharmaceutical Laboratories Ltd. (Caraco), at the company's Michigan facilities in Detroit, Farmington Hills, and Wixom. The seizure also includes ingredients held at these same facilities. "The FDA is committed to taking enforcement action against firms that do not manufacture drugs in accordance

with our good manufacturing practice requirements," said Janet Woodcock, M.D., director of the FDA's Center for Drug Evaluation and Research. "Compliance with these standards prevents harm to the public."

This action follows Caraco's continued failure to meet the FDA's current Good Manufacturing Practice (cGMP) requirements, which assure the quality of manufactured drugs. Through this seizure, the FDA seeks to immediately stop the firm from further distributing drugs until there is assurance that the firm complies with good manufacturing requirements.

Since January 2009, Caraco has initiated voluntary recalls of drug products to protect the public from potentially defective medications. The recalls involved manufacturing defects, including oversized tablets and possible formulation error.

The FDA has determined that the seizure of Caraco's drugs may create a shortage of one product, choline magnesium trisalicylate oral tablets, which are commonly used as pain relievers. The FDA recommends in the event of a shortage, that health care providers consider alternative treatments that are safe and effective. Consumers and health care providers who are unable to obtain any of Caraco's products should contact the FDA Drug Shortage Program by e-mail at drugshortages@fda.hhs.gov, or by telephone at 888-463-6332 or 301-796-3400.

The FDA's most recent inspection of Caraco, completed in May 2009, found unresolved violations of cGMP requirements. Today's seizure is intended to lead to major changes at Caraco's facilities.

If the FDA identifies further significant problems, which pose risks to patient safety with any Caraco drug products on the market, the agency will take appropriate additional regulatory action and immediately notify the public.

"The FDA will continue to take swift, aggressive enforcement action when firms are identified as being in violation of our manufacturing requirements," said Michael Chappell, FDA acting associate commissioner for regulatory affairs.

Seizure of drug products is an effective remedy when there is evidence of continued poor compliance with cGMPs. Following a drug product seizure, companies often agree to a wide range of changes and improvements to their drug manufacturing practices at their facilities.

(Emphasis in original).

41.    On this news, shares of Caraco declined $1.79 per share, or 42.82%, to close on June

30

25, 2009, at $2.39 per share, on unusually heavy volume.

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Caraco's securities between May 29, 2008 and June 25, 2009, inclusive (the "Class Period") and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Caraco's securities were actively traded on        the American Stock Exchange ("AMEX").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Millions of Caraco shares were traded publicly during the Class Period on the AMEX and as of June 10, 2009, shortly near the end of the Class Period, the Company had 37,458,194 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Caraco or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class and securities litigation.

46.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Caraco; and

(c)    To what extent the members of the Class have sustained damages and the proper measure of damages.

47.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

48.    The market for Caraco's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Caraco's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Caraco's securities relying upon the integrity of the market price of the Company's securities and market information relating

32

to Caraco, and have been damaged thereby.

49.     During the Class Period, Defendants materially misled the investing public,

thereby inflating the price of Caraco's securities, by publicly issuing false and/or misleading

statements and/or omitting to disclose material facts necessary to make Defendants' statements, as

set forth herein, not false and/or misleading.  Said statements and omissions were materially false

and/or misleading in that they failed to disclose material adverse information and/or misrepresented

the truth about Caraco's business, operations, and prospects as alleged herein.

50.     At all relevant times, the material misrepresentations and omissions particularized

in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by Plaintiff and other members of the Class.  As described herein, during the

Class Period, Defendants made or caused to be made a series of materially false and/or misleading

statements about Caraco's financial well-being and prospects.  These material misstatements and/or

omissions had the cause and effect of creating in the market an unrealistically positive assessment

of the Company and its financial well-being and prospects, thus causing the Company's securities

to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or

misleading statements during the Class Period resulted in Plaintiff and other members of the Class

purchasing the Company's securities at artificially inflated prices, thus causing the damages

complained of herein.

## LOSS CAUSATION

51.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused

the economic loss suffered by Plaintiff and the Class.

52.     During the Class Period, Plaintiff and the Class purchased Caraco's securities

33

at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

53.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Caraco, his/her control over, and/or receipt and/or modification of Caraco's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Caraco, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

54.     The market for Caraco's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Caraco's securities traded at artificially inflated prices during the Class Period. On May 30, 2008 the price of the Company's common stock closed at a Class Period high of $17.22 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's

securities relying upon the integrity of the market price of Caraco's securities and market information relating to Caraco, and have been damaged thereby.

55.     During the Class Period, the artificial inflation of Caraco's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Caraco's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Caraco and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

56.     At all relevant times, the market for Caraco's securities was an efficient market for the following reasons, among others:

(a)     Caraco stock met the requirements for listing, and was listed and actively traded on the AMEX, a highly efficient and automated market;

(b)     As a regulated issuer, Caraco filed periodic public reports with the SEC and the AMEX;

(c)     Caraco regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures,

such as communications with the financial press and other similar reporting services; and

        (d)      Caraco was followed by securities analysts employed by major

brokerage firms who wrote reports about the Company, and these reports were distributed to the

sales force and certain customers of their respective brokerage firms. Each of these reports was

publicly available and entered the public marketplace.

      57.    As a result of the foregoing, the market for Caraco's securities promptly

digested current information regarding Caraco from all publicly available sources and reflected such

information in Caraco's stock price. Under these circumstances, all purchasers of Caraco's securities

during the Class Period suffered similar injury through their purchase of Caraco's securities at

artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

      58.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The

statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

In addition, to the extent certain of the statements alleged to be false may be characterized as forward

looking, they were not identified as "forward-looking statements" when made and there were no

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. In the alternative, to the

extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded

herein, Defendants are liable for those false forward-looking statements because at the time each of

those forward-looking statements was made, the speaker had actual knowledge that the forward-

looking statement was materially false or misleading, and/or the forward-looking statement was

36

authorized or approved by an executive officer of Caraco who knew that the statement was false when made.

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

59.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Caraco's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

61.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Caraco's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

62.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about Caraco's financial well-being and prospects, as specified herein.

63.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Caraco's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Caraco and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

64.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded

38

was materially false and misleading.

65.    The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Caraco's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

66.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Caraco's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Caraco's securities during the Class Period at artificially high prices and were damaged thereby.

67.    At the time of said misrepresentations and/or omissions, Plaintiff and other members

of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Caraco was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Caraco securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

68.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.


**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     The Individual Defendants acted as controlling persons of Caraco within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the

40

decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

73.     As set forth above, Caraco and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: July 17, 2009    **THE MILLER FIRM**

By: /s/ E. Powell Miller
E. Powell Miller (P39487)
Marc L. Newman (P51393)
Darryl G. Bressack (P67820)
950 West University Drive, Suite 300
Rochester, Michigan 48307
Telephone:    (248) 841-2200
Facsimile:    (248) 652-2852
Email: epm@millerlawpc.com

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
Richard A. Maniskas
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone:    (310) 201-9150
Facsimile:    (310) 201-9160

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone:    (215) 638-4847
Facsimile:    (215) 638-4867

*Attorneys for Plaintiff Jonathan Wilkof*

42

SWORN CERTIFICATION OF PLAINTIFF

Caraco Pharmaceutical Laboratories, Ltd., SECURITIES LITIGATION

I, Jonathan Wilkof, certify that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase Caraco Pharmaceutical Laboratories, Ltd., the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Caraco Pharmaceutical Laboratories, Ltd., during the class period set forth in the Complaint are as follows:

   I bought __100__ shares on __6__/__18__/__2009__ at $__4.54__ per share.
   I bought _____ shares on ___/___/___ at $_____ per share.
   I bought _____ shares on ___/___/___ at $_____ per share.
   I bought _____ shares on ___/___/___ at $_____ per share.
   I bought _____ shares on ___/___/___ at $_____ per share.

   I sold _____ shares on ___/___/___ at $_____ per share.
   I sold _____ shares on ___/___/___ at $_____ per share.
   I sold _____ shares on ___/___/___ at $_____ per share.
   I sold _____ shares on ___/___/___ at $_____ per share.
   I sold _____ shares on ___/___/___ at $_____ per share.

   (List Additional Transactions on a Separate Page If Necessary)

5. I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

   _____ Check here if you are a current employee or former employee of the defendant Company

   I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: __7/6/2009__                    _____
                                        (Please Sign Your Name Above)