UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JONATHAN WILKOF, ET AL.,

      Plaintiffs,

v.

CARACO PHARMACEUTICAL LABORATORIES,
LTD.,

      Defendants.

_____/

Case No.  09-12830

SENIOR UNITED STATES DISTRICT JUDGE
ARTHUR J. TARNOW

MAGISTRATE JUDGE DONALD A. SCHEER

**ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [49] AND FINDING DEFENDANTS' MOTION FOR LEAVE TO FILE A REVISED EXPERT REPORT MOOT [62]**

Before the Court is Plaintiffs' Motion for Class Certification [49].  On December 16, 2011, the Court heard oral argument on the motion.  For the reasons stated below, Plaintiffs' Motion is GRANTED.

Plaintiffs propose as a class persons who purchased or acquired Caraco Pharmaceutical's ("Caraco") marketed securities (in the form of common stock) during the period between May 29, 2008[1] and June 25, 2009 (the "class period").  Plaintiffs allege that Defendant's statements and press releases were false, misleading, and/or contained material omissions.  Plaintiffs allege that statements by Defendant falsely and misleadingly indicated that Defendant was in compliance or would soon be in compliance with FDA regulations.  Plaintiffs allege that Defendants' false and

_____

[1]The beginning of the proposed class period is time to coincide with an inspection of Defendant Caraco's manufacturing facility by the FDA, which took place between May 1, 2008 and June 11, 2008.  This inspection allegedly resulted in a report that highlighted significant problems with Caraco's ability to produce pills of acceptable quality.  Amended Compl. ¶ 60.  The end of the class period is the date on which the FDA announced that U.S. Marshals had seized drug products manufactured by Caraco; Caraco's stock prices declined by 43%.  Amended Compl. ¶ 17.

misleading statements artificially inflated the price of Defendant's stock, and that the subsequent drop in value of the stock after Defendant's false representations came to light injured the Plaintiffs. Plaintiffs allege violation of sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, as well as SEC Rule 10b-5.

**Procedural Background**

Plaintiffs initiated the instant case on July 17, 2009, and filed an Amended Complaint [23] on February 11, 2010.  On April 12, 2010, Defendants filed a Motion to Dismiss [28] that was granted in part by this Court on October 21, 2010.[2]  Plaintiffs filed the instant class certification motion on April 15, 2011.

**Factual Background**

Plaintiffs filed this federal class action suit on July 17, 2009.  Plaintiff seeks to certify as a class purchasers of Defendant Caraco's securities between May 29, 2008 and June 25, 2009, alleging violations of federal securities laws.  According to the Amended Complaint, Defendant Movens served as CEO of Caraco and Defendant Shanghvi was the chairman of Caraco's Board of Directors. Amended Compl. ¶¶ 27-29 (the "Individual Defendants").  Defendant Sun Pharmaceuticals was the majority and controlling shareholder of Caraco.  *Id.* ¶ 30.

Plaintiffs allege that Caraco was informed by the Food and Drug Administration ("FDA") after various inspections between 2005 and 2008, about defective and deficient conditions in Caraco's manufacturing facilities.  *See* Amended Compl. ¶ 6.  Failure to comply with the FDA's current Good Manufacturing Practices can cause delay in the approval of a drug application and, if serious problems continue, can lead to a finding that drugs are "adulterated," requiring a company

---

[2]This Court dismissed one of the claims against Defendant Sun Pharmaceuticals and denied the remainder of the Motion to Dismiss.

2

to "cease all production and distribution." Amended Compl. ¶ 5. According to various confidential witnesses who were employed by Caraco, the conditions in the company's Detroit facility were very poor and included contamination and production of pills that were not the proper size. Amended Compl. ¶ 7. Despite knowledge of the company's problems, Defendant Caraco allegedly "minimized both their scope and overall significance" to the public. Amended Compl. ¶¶ 6, 8.

In October 2008, the FDA issued a warning letter to Caraco indicating "that its May 1, 2008 to June 11, 2008 inspection of Caraco's manufacturing facilities revealed "'significant deviations from'" cGMP regulations and that a failure to correct the various violations noted could result in legal action. Amended Compl. ¶¶ 70-73. Some of the observations included in the warning letter included the "failure of the Quality Control Unit . . . to review and approve all drug product production" to ensure compliance with approved procedures before a batch was distributed, and a "failure to maintain equipment at appropriate intervals to prevent malfunctions or contamination that would alter the safety" and "purity" of the drugs. Amended Compl. ¶ 71. After news of the warning letter was released, shares of Caraco dropped by approximately 22% over three days, closing on November 5, 2008 at $7.91 per share. Amended Compl. ¶ 10. Caraco continued to represent to investors that the company had taken corrective action. Amended Compl. ¶ 74.

On March 31, 2009, Caraco "disclosed that it had commenced a voluntary recall, with the knowledge of the FDA, of certain tablets manufactured by the Company because the tablets might have differed in size and therefore could have more or less of the active ingredient." Amended Compl. ¶ 14. Following this disclosure, stocks dropped more than 22%, closing at $3.52 per share. Amended Compl. ¶ 125. Although this recall indicated various problems at Caraco, the complete extent of the company's problems were not shared with the public. Amended Compl. ¶ 15.

3

On June 15, 2009, Caraco stated in a filing with the SEC that it believed it was "substantially cGMP compliant." On June 24, 2009, the government filed a complaint for forfeiture of adulterated articles of drugs located in Caraco's facilities in Farmington Hills and Wixom, Michigan. Amended Compl. ¶¶ 131-133. The complaint alleged that the FDA had found "continuing and significant violation of cGMP."

Ultimately, "on June 25, 2009, investors learned the true extent of Caraco's severe and systemic manufacturing problems. That day, the FDA announced that U.S. Marshals had seized drug products manufactured by Caraco from the Company's facilities" as a result of "Caraco's continued failure to meet the FDA's cGMP requirements . . . ." Amended Compl. ¶ 17. The FDA indicated that the aim of the seizure was to prevent the company from continuing to distribute drugs until there was "assurance that the firm complies with good manufacturing requirements." Amended Compl. ¶ 17-18. On June 25, 2009, shares of Caraco dropped approximately 43%, closing that day at $2.39 per share. Amended Compl. ¶¶ 17-18.

Plaintiffs' complaint sets forth two claims. First, violation of Section 10(b) of the Exchange Act[3] and of Rule 10b-5[4] promulgated thereunder. Plaintiffs allege that Defendants carried out a plan

---

[3] Section 10(b), set forth in 15 U.S.C. §78j(b), makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security... any manipulative or deceptive device in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

[4] This rule, set forth in 17 C.F.R. 240.10b-5, states, "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or © To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

4

intended to deceive the public, caused Plaintiffs to purchase Caraco securities at artificially inflated prices, and knowingly and/or recklessly made false statements[5] and omitted material facts in order to mislead the public about Caraco's operations

Second, Plaintiffs allege violation of section 20(a) of the Exchange Act[6] by Defendant Sun Pharmaceuticals and Defendants Movens and Shanghvi. Plaintiffs allege these Defendants had direct and supervisory involvement in Caraco's operations. Plaintiffs argue that by virtue of Sun Pharmaceuticals's and the Individual Defendants' positions as "controlling persons," they are liable pursuant to Section 20(a).

**Standard of Review**

Class Actions are governed by Federal Rule of Civil Procedure 23, which requires that, to obtain class certification, plaintiffs must demonstrated that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

---

[5] The statements Plaintiffs allege are false and misleading are identified at ¶100, 102, 104, 106, 108, 110, 112, 114, 118, 120, 122, 129, and 131 of the Amended Complaint. Following the statements are explanations of how it they were false and/or misleading.

[6] Section 20(a), 15 U.S.C. § 78t(a), states, "Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Fed. R. Civ. P. 23(a);

If all four prerequisites from 23(a) and at least one from 23(b) are met, a class may be certified. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997); *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998).

Under Rule 23(b) a class may be maintained if 1) prosecuting separate actions would create a risk of inconsistent results or an adjudication as to one class member would substantially impair or impede another's ability to protect her interests; 2) the party opposing the class has acted or refused to act on grounds that apply generally to the class; or 3)

the court finds that questions of law or fact common to all class members predominates over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

1. the class members' interests and individually controlling the prosecution or defense of separate actions;

2. the extent and nature of any litigation concerning the controversy already begun by or against class members;

3. the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4. the likely difficulties in managing a class action.

Fed. R. Civ. Proc. 23(b)(3). Plaintiffs argue that Fed. R. Civ. Proc. 23(b)(3) applies to this case.

The Supreme Court has held that:

[t]he class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. In order to justify a departure from

6

that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members. Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims.

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (internal quotations and citations omitted).

Nevertheless, a district court "retains broad discretion in determining whether an action should be certified as a class action . . . ." *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988). In establishing that class certification is warranted, generally "[t]he party seeking the class certification bears the burden of proof." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). The four factors of 23(a) and one of the factors of 23(b) must be proven by a preponderance of the evidence. *Id.* at 1079-80. This Court must perform a "rigorous analysis" of the evidence to determine if the party seeking class certification has met their burden of proof. *Id.* at 1078-79 (citing *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 160 (1982)). However, class certification in cases where "fraud-on-the-market" doctrine applies is "routine" because "each investor's loss usually can be established mechanically, [and] common questions predominate. . . ." *Schleicher v. Wendt*, 618 F.3d 679 (7th Cir. 2010).

This Court will not inquire into the merits of the case, as there is "nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. Indeed, such a procedure contravenes the Rule . . . ." *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177 (1974).

**Rule 23(a) Factors**

**1. Plaintiffs' Class is Sufficiently Numerous**

Defendants do not contest this factor, and there seems little doubt that Plaintiffs are sufficiently numerous.  During the relevant period shares of Caraco were traded at the rate of between 88,590 to approximately 100,000 shares per day on average.  Pls.' Mot. for Class Certification ("Motion"), Ex. 1 ("Feinstein Report") ¶ 35; Defs. Resp. ("Response") to Motion, "Report - Market Efficiency, H. Berg" ("Berg Report") ¶ 10.  While trading at such volume does not necessarily indicate the number of Plaintiffs involved, it seems reasonable to estimate that the number of Plaintiffs is sufficiently high.  Numerosity "is generally assumed to have been met in class action suits involving nationally traded securities." *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 479 (W.D. Mich. 1994) (citing *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. 1981)).  There is no particular number necessary to meet the numerosity requirement of Rule 23, nor does the class number need to be known with precision.  *See Rodriguez ex rel. Rodriguez v. Berry Brook Farms, Inc.*, 672 F. Supp. 1009, 1013 (W.D. Mich. 1987).  Further, as Plaintiffs note, Caraco stocks are traded nationally and possible members of the class are located throughout the country, making joinder impracticable.

The Court therefore finds that Plaintiffs' proposed class is sufficiently numerous so that joinder of all members would be impracticable.

**2. There are Common Questions of Law or Fact**

Defendants do not contest this factor.  While Defendants argues that Plaintiffs cannot demonstrate that common issues of law and fact predominate, this goes to the requirements of Fed. R. Civ. P. 23(b)(3), discussed below.  Response at 38.  Plaintiffs allege that questions of law and fact common to the class include:

8

(1) whether the federal securities laws were violated by Defendant's acts[,] (2) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Caraco, and (3) to what extent the members of the Class have sustained damages, and the proper measure of damages.

Motion at 4. The common question factor is concerned with whether there is a common issue "the resolution of which will advance the litigation." *Saur v. Snappy Apple Farms, Inc.*, 203 F.R.D. 281, 287 (W.D. Mich. 2001). There need only be a single issue common to all class members to meet this requirement. *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998). The test for common questions of law or fact is "qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class." *In re Am. Med. Sys., Inc.*, 75 F.3d at 1080. Thus, the "mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988).

The Court finds that there are common questions of law or facts among the proposed class members. The central questions of whether Defendants violated securities' laws and, if so, the extent of Plaintiffs' damages dominate this case, and individual Plaintiff's cases would clearly have questions of law or fact in common.

**3. The Claims of Proposed Class Plaintiffs are Typical of Members of the Proposed Class**

"[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys.*, 75 F.3d at 1082. The purpose of the typicality

requirement is to assure that the named representative's interests align with those of the class and that the plaintiff will advance the interest of the class. *Id.* If the class representative and the class members have claims based on the same legal or remedial theory, typicality is not defeated, even if the claims are not identical. *See Adamson v. Bowen*, 855 F.2d 193, 198 (10th Cir. 1988); *see also Coleman v. Pension Ben. Guar. Corp.*, 196 F.R.D. 193, 198 (D.D.C. 2000). To be typical, "a [class] representative's claim need not always involve the same facts or law, provided there is a common element of fact or law." *Senter v. Gen. Motors Corp.*, 525 F.2d 511, 525 n.31 (6th Cir. 1976).

Plaintiffs argue their claims are typical because "all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws." Motion at 14. Plaintiffs argue that their purchase of Caraco stocks during the Class Period "at prices artificially inflated by Defendants' misrepresentations and ommissions" harmed Plaintiffs are make their claims typical of those of the proposed class. Defendants counter with a numbers of arguments; these arguments also speak to the requirement under Fed. R. Civ. P. 23(b)(3) that "questions of law or fact common to class members predominate over any questions affecting only individual members."

## A. Conflicts Between Class Members

Defendant argues that the proposed class is "fractured" because various members of the proposed class will have bought and sold stocks at various times during the Class Period. Defendants assert that this will lead to conflicting arguments. As an example, Defendants highlight named Plaintiffs Koziatek and Amin. Defendants note that Koziatek bought Caraco stock on May 29, 2009, while Amin sold stock on the same day. Defendants argue that, to claim damages, plaintiffs such as Amin will have to claim they were harmed because prices were depressed and they received too little for the sale of their stock, while plaintiffs such as Koziatek will have to argue that they were harmed because stock prices were inflated and they paid too much for the stock.

10

Defendants argue that this will lead to inherent and irreconcilable conflict among the class plaintiffs. Defendants cite to *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 480 (W.D. Mich. 1994), for support of their argument that in any case where "numerous curative statements" are made throughout the class period (as here) "inherent conflict in the class make[s] it impossible for anyone to be a typical representative for entire class period."  Defendants also rely on *In re Seagate Tech. II Sec. Litig.*, 843 F. Supp. 1341, 1359 (N.D. Cal. 1994) for the proposition that purchasers and sellers of stock would have interests hostile to one another and that this hostility is "pervasive enough to threaten to preclude satisfaction fo the adequacy of representation element of FRCP 23."

The Court finds Plaintiffs' argument persuasive.  All class members will have the same central argument: That they relied on the false representation of Defendant to their detriment. "[T]he claims of both pre- and post- July 19th purchasers arise from the same pattern or practice of alleged fraud . . . and rely on the same legal theory, they share a sufficient nexus to establish typicality." *In re Scientific-Atlantica, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1326-27 (N.D. Ga. 2007) (citing *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)).  Whether purchasing at what is perceived as a low price or selling at what is perceived at a high price, investors rely on information released by Defendants; if said information is false, all investors are harmed when that information distorts the marketplace.  The particular harm to each investor is a question of damages to be determined after a finding of liability.

Moreover, the cases Defendants primarily rely upon, *Ballan* and *Seagate II*, "knowingly rejected the traditional rule that a plaintiff class should be certified despite conflicts over damage issues between early and late sellers of the stock."  *Picard Chemical, Inc. Profit Sharing Plan v. Perrigo Co.*, 1996 WL 739170 (W.D. Mich. 1996) (referring to *Seagate II*); *see also Blackie v. Barrack*, 524 F.3d 891 (9th Cir. 1975) (setting out traditional rule); *In re Mutual Sav. Bank Sec.*

11

*Litig.*, 166 F.R.D. 377 (E.D. Mich. 1996) (acknowledging view that most courts have declined to follow the reasoning in *Seagate II* and *Ballan* and declining to follow *Seagate II*).

This Court similarly rejects *Seagate II* and *Ballan*. If Defendants' argument was correct, potential classes in securities litigation would be sliced and diced in any number of ways based on when potential plaintiffs interacted with a defendant's securities, and what sort of interaction took place. This would defeat the purpose of class action in securities cases. Plaintiffs in this case all must make the same central claim; it is only when determining damages at a later stage that Plaintiffs will have to separately set out the particular injuries they suffered. *See Blackie v. Barrack*, 524 F.3d 891, 905 (9th Cir. 1975) (holding that "[t]he amount of damages is invariably an individual question and does not defeat class action treatment"). Further, should the damages portion of litigation involve conflict between class members, the Court can create sub-classes of plaintiffs at said stage of the case. *See Blackie*, 524 F.3d 891; Fed. R. Civ. P. 23(c)(4).

**B. Differences Between Institutional Investors and Individual Investors, Sophistication**

Defendants next argue that there is an "inherent conflict" between institutional investors, such as large investment firms, and individual investors, based upon the information that said investors rely on in making their investment decisions. Much of this argument relies on Defendants avoiding the presumptive reliance gained by the application of the "fraud-on-the-market doctrine." However, Defendants argue that even with presumptive reliance, institutional investors are so different from individual investors as to prevent class certification.

Defendants' argument boils down to several affidavits from representatives of particular institutional investors, such as the Vanguard Group and State Street Global Advisors. Defendants argue that said institutional investors do not rely on statements or press releases made by a company, but rather rely on "quantitative analyses of stocks" that include metrics such as a company's financial

statements, the market price of stocks, a stock's inclusion in an index, a stock's growth, and other "statistical data." Defendants also argue that institutional investors are "sophisticated" and can thus "filter[] between possibly puffery . . . and legally binding statements." Response at 27.

Plaintiffs persuasively argue that even sophisticated institutional investors rely on the market in making their purchasing decisions. Whether institutional investors rely on a stock's inclusion in an index, the price of the stock, or other qualitative factors, said factors are based on the market providing reliable information. "[B]ecause index purchasers seek only to match the index and exclude other considerations . . . index purchasers rely *exclusively* upon the market to impound any representations (including misrepresentations) into securities' prices." *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 602 (C.D. Cal. 2009). Similarly:

> [a] purchaser on the stock exchanges may be either unaware of a specific false representation, or may not directly rely on it; he may purchase because of a favourable price trend, price earnings ratio, or some other factor. Nevertheless, he relies generally on the supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price, and thus indirectly on the truth of the representations underlying the stock price whether he is aware of it or not, the price he pays reflects material misrepresentations. Requiring direct proof from each purchaser that he relied on a particular representation when purchasing would defeat recovery by those whose reliance was indirect, despite the fact that the causational chain is broken only if the purchaser would have purchased the stock even had he known of the misrepresentation.

*Blackie*, 524 F.2d at 907.

Further, even if a plaintiff is sophisticated, "this does not render him atypical with respect

to this position as class representative because he may have relied unwittingly on the same misrepresentations that may also have induced other investors to buy the stock. If the defendant perpetrated a fraud on the market, then even the most sophisticated investor would be deceived." *Michaels v. Ambassador Grp., Inc.*, 110 F.R.D. 84, 89 (E.D.N.Y. 1986) (citing *Leist v. Tamco*, 94 F.R.D. 570, 572 (S.D.N.Y. 1982)).

The Court finds that the presence of institutional investors as shareholders and purchasers of Caraco stock during the proposed Class Period does not prevents class certification. The Court finds that institutional investors need not be placed in a separate sub-class at this time. Said investors used market-based metrics in their stock purchases; thus, the central question of whether Defendants in fact distorted the market through false representations remains the common question between both institutional and individual investors. Finally, the Court finds that Plaintiffs' claims are typical of the claims of the class. They claim injury stemming from Defendant's alleged false representations and the effect of those false representations on the market. Plaintiffs' claims are typical of those that will be made by class members in this case.

**C. Suggestion of Sub-Classes**

Defendants contend that the class period should begin not on May 29, 2008, as suggested by Plaintiffs, but rather on November 3, 2008. Defendants select November 3, 2008 as the date to begin the class period because said date is the first date on which Plaintiffs' expert found a "significant event," notably, a statement from Caraco that all was well with their FDA compliance. Tr. at 37-38. Defendants' argument does not take into account Plaintiffs' theory of the case - that Defendants engaged in an ongoing fraud from May 29, 2008 through June 25, 2009. Plaintiffs' whole theory is that Defendants' stock price was artificially inflated during this time because the company was concealing negative information; it would make little sense to base the beginning of

14

class period on when the alleged actual state of affairs at Caraco began to leak out. At that point, Caraco's stock prices would have begun to readjust to reflect the reality of their situation. Such a narrow class period would not take into account the period when Caraco's stock prices were allegedly artificially inflated. The Court thus reject Plaintiffs' proposed alternative class period.

Defendants similarly argue that the class period should not begin in May of 2008 because Caraco's stock "fell in lockstep with the Russell 2000 and the remainder of the market . . . Caraco should not be held responsible for the depression in its stock price that can be shown to mark the crash of the market." Tr. at 45. The Court agrees that Caraco should not be held responsible for the depression in stock prices caused by the market crash; however, this is a question of damages and a determination of the extent to which Caraco's alleged fraud may have affected their stock prices. It is not an argument for limiting the class period.

Defendants also argue the class period should end on May 29, 2009 (rather than on June 25, 2009), because on said day one class representative bought stock, and another sold stock. Defendants argue, relying on *Seagate II*, that the "antithetical" positions created by some plaintiffs buying and others selling means there can be no class period following this date. Tr. at 38. The Court has already rejected the position that the fact that some plaintiffs bought and others sold stock during the class period creates a conflict between plaintiffs at the class certification period. The Court declines to limit the class period based on this argument.

Defendants argue, in the alternative, that even if the Class period begins on 29, 2008, the Court should nevertheless create a number of sub-classes of plaintiffs based upon the specific time when plaintiffs in the proposed sub-classes bought and sold Caraco stock. Defendants also argue that there should be named plaintiffs for each sub-class based upon a distinct time period.

15

Plaintiffs argue that it is impossible to separate the events described in the complaint and create "sub-classes" of plaintiffs because when there is a "partial disclosure, that just means there's less fraud on the market. So the prices come down somewhat. But until there is full disclose, there is still an artificial component of that price and there's still damages. So you can have a price decline . . . throughout the class period that reflects a fraud . . . until it is completely revealed what is happening, and that is when the class period ends." Tr. at 32.

### 4. The Representative Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

To adequately represent a class, representative plaintiffs must "have common interests with unnamed members of the class," and "it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *In re Am. Med. Sys., Inc.*, 75 F.3d at 1083 (quoting *Senter*, 532 F.2d at 525). Further, the court should consider whether the class members have interests that are antagonistic to one another. *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000).

Defendants do not dispute that Plaintiffs' counsel are qualified, and Plaintiffs provides sufficient evidence, through affidavits, resumes, and descriptions of the firms involved that counsel are qualified. Plaintiffs have also demonstrated their intent to vigorously prosecute the case, as they have submitted to deposition and have pursued the case through a motion to dismiss and discovery.

Plaintiffs also persuasively argue that they have interests in common with unnamed members of the class; namely, Plaintiffs have allegedly suffered financial injury due to Defendants' false representations and statement. Plaintiffs, like the unnamed members of the class, have an interest in redressing said financial injury. The Court finds that Plaintiffs will fairly and adequately protect the interests of the class.

16

**Rule 23(b)(3): Common Questions of Law or Fact Predominate Over Questions Affecting Individual Members - Fraud-on-the-Market Doctrine**

Defendants argue that Plaintiffs cannot establish that common questions of law or fact predominate over the individual questions and concerns of the class plaintiffs.  Defendants argue that Plaintiffs have failed to establish fraud-on-the-market doctrine as a substitute for demonstrating the reliance of individual class members on the representations of the Defendants.  Absent the presumption provided by fraud-of-the-market doctrine, Defendants argue, the individual question of whether the plaintiffs relied upon the defendants' alleged deceptive acts will predominate over common questions of law or fact, as "[r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action."  *Erica P. John Fund, Inc. v. Haliburton Co.*, 131 S. Ct. 2179, 2184 (2011) (quoting *Stoneridge Inv. Partners LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008)).

"The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . Misleading statements will therefore defraud purchasers of stock even if the purchases do not directly rely on the misstatements . . . ."  *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).  When fraud on the market is proven, it established a rebuttable presumption of class-wide reliance on defendant's representations.  *Id.* at 245-47.  To invoke the fraud-on-the-market presumption, Plaintiffs must demonstrate that "the alleged misrepresentations were publicly known (else how would the market take them into account?), that the stock traded in an efficient market, and that the relevant transaction took place 'between the time the misrepresentations were made and the time the truth was revealed.'"  *Erica P. John Fund, Inc. v.*

17

*Haliburton Co.*, 131 S. Ct. 2179, 2185 (2011) (quoting *Basic*, 485 U.S. at 241-47, 248 n.27)). Here, the parties dispute only whether Caraco stocks were traded in "an efficient market."

The parties agree that the "seminal decision" on market efficiency is *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). The Sixth Circuit has recognized the usefulness of these factors in determining market efficiency. *See Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990). *Cammer* set forth five factors to consider in determining whether a particular stock is traded in an efficient market: (1) whether there is an "average weekly trading volume during the class period" that can be considered "large," (2) whether "a significant number of securities analysts followed and report on [the] company's stock during the class period," (3) whether the company's stock "had numerous market markers," (4) whether "the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to form S-3 were not met . . . it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency" and (5) whether "empirical facts showed a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1286-87.

## A.   Average Weekly Trading Volume

In *Cammer*, the court found that "weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." 711 F. Supp. at 1293. The *Cammer* court also held that "at a minimum, there should be a presumption - probably conditional for class determination - that certain markets are developed and efficient for virtually all the securities trade there: the New York and American Stock Exchanges . . . ." *Id.* at 1292. Caraco's stock is traded on the American Stock

Exchange, traded regularly through the Class Period, and traded every day during the Class Period. Feinstein Report ¶¶ 23, 35.

On average, shares of Caraco were traded at the rate of between 88,590 to approximately 100,000 shares per day.  Feinstein Report ¶ 35; Berg Report ¶ 10.[7]  While Plaintiffs' and Defendant's experts disagree about the specific average weekly trading volume by percent, it is undisputed that the percentage of outstanding shares traded on a weekly basis was between 1% and 2%, thus triggering a "substantial presumption" of market efficiency according to the *Cammer* factors.  Feinstein ¶ 36; Berg Report ¶ 43.[8]

Defendants attempt to artificially deflate the average weekly trading volume by arguing that the "average weekly trading volume changed significantly over the proposed class period." Response at 33 (citing Berg Report ¶ 10).  Defendants thus examines a narrow range of dates (between May 29, 2008, and November 1st, 2008, and determines that, for said period, the average weekly trading volume was 0.90%.  Response ¶¶ 33-34.  Defendants' expert, when asked why said particular range was significant, honestly answered that the range had been chosen to demonstrate that stocks were trading at a lower volume in a particular range.  Pls.' Reply, Exhibit 2 ("Berg Deposition") at 25-27.  Cherry-picking a range of dates without reference to significant events, or indeed, without any reasoning at all simply manipulates the "average" in the "average weekly trading volume."

---

[7]Defendants' expert omits the final day of the class period, in which over 2,000,000 shares were traded, as an "outlier."  Defendants cannot provide any authority for omitting a date on which the number of shares sold spiked because of revelations regarding the seizure of drugs manufactured by Defendants.  Tr. at 50-51.  The characterization of this date as an "outlier" does not allow Defendants to exclude a date made significant by their allegedly fraudulent statements and activities.

[8]Specifically, Feinstein found that the average weekly trading volume was 1.50% of shares outstanding; Berg found the average weekly trading volume was 1.27%.

The Court finds that a weekly trading volume of between 1 and 2% during the proposed class period creates a "substantial presumption" that the market was operating efficiently.

**B.      Analysts Reports on Caraco Stock**

Whether "a significant number of securities analysts followed and report on [the] company's stock during the class period" is relevant to determine market efficiency. *Cammer*, 711 F. Supp. at 1286. A "significant" number of analysts is not a hard-and-fast number. *See, e.g., Castillo v. Envoy Corp.*, 206 F.R.D. 464, 470 (M.D. Tenn. 2002) (finding that the company "was actively followed by securities analysts at major brokerage firms" and providing three examples*); In re Accredo Health, Inc. Sec. Litig.*, 2006 WL 1716910 (W.D. Tenn. 2006) (same, with eight examples); *cf. Lehocky v. Tidel Technologies, Inc.*, 220 F.R.D. 491, 508 (S.D. Tex. 2004) (finding that existence of three analyst reports, and possibility that four analysts covered company stock during class period was "neutral in terms of market efficiency").

Plaintiffs argue that their expert discovered analysts' reports written by 23 different firms that discussed Caraco, seven of which were written after the Class Period ended; said reports were not specifically about Caraco, but about Caraco's parent company, Sun Pharmaceuticals (which is based in Mumbai, India). The Court has examined some of said reports and finds that many of the reports focussed on Caraco's troubles and were not cursory. Feinstein Report ¶¶ 40-44.

Plaintiffs also note that 251 news articles were published that primarily focussed on Caraco during the Class Period. *Id.* ¶ 51. Defendants argue that Plaintiff has admitted that "no reports during the class period were issued regarding Caraco specifically," that the reports were issued primarily by "foreign analysts," and contends that "there is no evidence . . . that these reports indicate analysis of Caraco for the purposes of advising investors on the value of stock . . . ." However, such specific findings are not mentioned in *Cammer*; rather, the court in *Cammer*

20

emphasized that coverage by analysts of a company increases the availability of information about a company's stock, thus increasing the likelihood that investors rely on said information, indicating an efficient market. As long as the reports discuss Caraco's business and performance, whether said reports were prepared for the purpose of advising about Caraco's stock or Sun's stock is irrelevant; all that is relevant is that investors *could* have used them for informational purposes. Coverage by analysts and other articles about Caraco increase the likelihood, in the aggregate, that investors relied on information contained in said articles and reports. *See Cammer* at 1285-87. As alternatively put by Plaintiffs' counsel at the hearing "the reason for the factor is if we've got analysts that are looking at the stock, analysts disseminate information to investors, and therefore if analysts are looking at it, it's more likely it is an efficient market that's going to take into account information that comes in to the market." Tr. at 22.

The Court finds that coverage of Caraco by reports from a large number of analyst firms constitutes an indicator of market efficiency.

## C.     Whether Caraco's Stock Had Numerous Market Makers

According to the SEC, market makers are persons who, with respect to a particular security, regularly publish bids and offer quotations, furnish competitive bids and quotations on request, or are ready, willing and able to effect transactions in reasonable quantities at quoted prices with other brokers or dealers. *See* 17 C.F.R. § 240.15c3-1[c][8] (2006). The existence of market makers is relevant as an indicia of market efficiency according to *Cammer*, 711 F. Supp. at 1286-87. The court in *Cammer* stated that "[t]en market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." *Id.* at 1293.

21

Plaintiff, relying on their expert, claims that there were "at least" 167 market makers in Caraco stocks. Feinstein Report ¶ 60. Defendants do not contest that 167 market makers existed for Caraco stock. Tr. at 24.

The Court finds that there were far more than ten market makers for Caraco stock, thus justifying a "substantial presumption" that the market for Caraco stock was efficient.

**D.    Whether Caraco was Entitled to file an S-3 Registration Statement**

*Cammer* held that an indicia of market efficiency was whether "the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to form S-3 were not met . . . it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." Defendants characterize this requirement as "whether the security has filed an S-3 registration statements [sic]." Response at 30. As is obvious from the quote above, Defendants' characterization of this requirement is at odds with the case law. Plaintiffs' correctly argue that Caraco was eligible to file an S-3 Registration Statement throughout the Class Period, and Defendants' expert conceded at much at deposition. Berg Deposition ¶¶ 69-71.

Factors that the SEC uses to determine S-3 Registration eligibility include past reporting history, the value of the company's stock, and the listing of a company on a major stock exchange. Caraco was undoubtedly eligible for S-3 Registration prior to November, 2008, due to the value of its stock and its past reporting history. In November the value of Caraco stock plummeted, allegedly because of the information withheld by Caraco regarding its compliance with FDA guidelines. Plaintiffs persuasively argue that Caraco was still eligible for S-3 registration after November, 2008, due to its past reporting history and listing of a major stock exchange. Moreover, Plaintiffs note that

22

the only factor of S-3 Registration eligibility that change, value of stock, did so in reaction to the release of negative information; that the value of the stock fell after the release of bad news for Caraco is itself demonstrative of market efficiency.  Tr. at 25.

The Court finds that Defendants were "entitled to file an S-3 Registration Statement" during the Class Period, and that this factor is an indicia of an efficient market with respect to Caraco stock.

**E.**     **Whether Empirical Facts Showed Cause and Effect Relationship Between Unexpected Corporate Events and Stock Prices**

This factor involves the greatest amount of contention between Plaintiffs and Defendants. Essentially, Plaintiffs' and Defendants' experts supply duelling statistical analyses, through an "event study," purporting to demonstrate correlation (or the lack thereof) between "corporate events" and stock prices.  The two experts chose dates they considered "significant" and attempted to determine whether stock prices reacted to information released on those dates, controlled for various factors such as general volatility in the market.

Plaintiffs' expert selected five dates that he determined would be reasonably expected to have a "high valuation impact" because of the significance of the information released by Caraco on said dates.  *See* Feinstein Report ¶¶ 83-84.[9]  Plaintiffs' expert concluded that the event study demonstrated a cause-and-effect relationship between the release of negative news and stock prices; Plaintiffs' expert found that this relationship was significant over a two-day period following each announcement.  Feinstein Report ¶ 139.

_____

[9]Specifically, Plaintiffs' expert chose: November 3, 2008 (Caraco announces that it received a warning letter from FDA and has taken steps to correct issues, Caraco's stock rises in price by 19.68%); January 29, 2009 (Caraco announced its third quarter 2009 fiscal earnings, in which sales dipped sharply); March 31, 2009 (Caraco announced a recall of all tablets of one drug because of concerns about whether they were adulterated, Caraco's stock price falls 28.45%); May 29, 2009 (Caraco announces full year fiscal 2009 results); June 25, 2009 (FDA announced that U.S. Marshals had raided Caraco's Michigan facilities and seized adulterated pharmaceuticals, Caraco's stock price falls 56.92%).  Tr. at 28.

Defendants criticize Plaintiffs' expert in three ways:

First, Defendants argue that Plaintiffs' expert "cherry-picked" certain events to create a correlation. Plaintiffs respond that Defendants' expert merely selected every date mentioned in the complaint without bothering to assess whether Caraco released important information on said dates. Several flaws in this approach were discussed at oral argument. Dates analysed by Defendants' expert sometimes were sometimes duplicative, involving already-released information; this would tend to mute the effect on the market of information on the latter date. Similarly, Defendants' expert failed to correct for the fact that on some dates, information was released after the closing of the stock market; thus, the effect on stock prices would have occurred on the following day. Finally, Defendants' expert included dates on which Defendant Caraco released positive or neutral information assuring investors that there was no need to worry. Tr. 5-7.

It would make little sense that the release of a statement essentially stating "everything is fine" would be correlated to a change in stock prices. Thus, the Court finds that the methodology of Defendants' expert's analysis was flawed. The Court agrees that the logical approach is examine whether a correlation exists on the days following Caraco's release of significant new information. Defendants' approach is arbitrary and makes little sense; further, Defendants' expert made numerous mistakes in his analysis, undermining his credibility.

Defendants next argue that Plaintiffs' expert used an inappropriate index to account for general market volatility. Plaintiffs argue that the index chosen by Defendants' expert (the Russell 2000) is not approved of by the academic literature and reflect only the 2,000 smallest capitalized companies in a particular narrow field of stock trading. Plaintiffs persuasively argue that the index they have used, the CRSP, is a broad index that comprises all stocks traded in most Stock Exchanges, and thus provides a better picture of overall market volatility.

24

The Court agrees finds that the CRSP is more appropriate in this context, given the goal of accounting for overall market volatility, rather than volatility within one particular sector of the market. This is particularly relevant given that the stock market was very much in flux during the class period.

Third, Defendants' argue that Caraco's stock price fell throughout the Class Period (and that a decline occurred shortly before the Class Period began) and therefore the decline could not have been caused by Caraco's alleged fraud. This argument goes to the merits of the case. Even if stocks in general were declining, more analysis is needed to determine what portion of the decline is attributable to Defendants' alleged fraud, and what portion to the general market decline during this period.

The Court finds that the empirical data suggests a cause-and-effect relationship between Caraco's "unexpected corporate events" through releases of information and the price of Caraco's stock. This suggests an efficient market.

**F.      Efficient Market and Rule 23(b)**

The Court finds that all five factors set out in *Cammer*, tending to demonstrate an efficient market, are in Plaintiffs' favour. It is undisputed that there were sufficient market makers in Caraco's stock to justify a substantial presumption of market efficiency. Moreover, the Court finds that the average weekly trading volume, the number of analysts who report on the Caraco's stock, Caraco's eligibility to file an S-3 Registration Statement, and empirical facts demonstrating a cause-and-effect relationship between unexpected corporate events and statements and an immediate response in stock price establish market efficiency. As Plaintiffs have provided evidence that Caraco stocks were traded in an efficient market, the Court finds that the fraud-on-the-market doctrine provides a presumption of reliance by class members on Defendants' statements and press

releases.  As the issue of reliance is therefore common to all Plaintiffs, common questions of law and fact predominate and the requirement of Rule 23(b)(3) are met.

**Defendants' Motion for Leave to File a Revised Expert Report [62]**

On September 16, 2011, Defendants' moved to file a revised expert report for the purpose of clarifying that Defendants no longer disputed that market makers existed with respect to Caraco stock, *infra* 23-24.  The Court was made aware, both through Defendants motion and at the hearing, that Defendants no longer disputed that market makers for Caraco stock existed.  Defendants' motion is **MOOT.**

**Conclusion**

Plaintiffs have met all four of the Rule 23(a) factors required for class certification.  In addition, Plaintiffs have met the requirement of Rule 23(b)(3) that questions of fact or law common to the class predominate over individual questions.  The Court therefore finds that class certification is appropriate.

**THEREFORE**, Plaintiffs' Motion for Class Certification [49] is **GRANTED.**  Defendants' Motion for Leave to File a Revised Expert Report [62] is **MOOT.**

**SO ORDERED.**

s/Arthur J. Tarnow
ARTHUR J. TARNOW
SENIOR UNITED STATES DISTRICT JUDGE

Dated: February 28, 2012

---

**CERTIFICATE OF SERVICE**

I hereby certify on February 28, 2012 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on February 28, 2012: **None.**

s/Michael E. Lang
Deputy Clerk to
District Judge Arthur J. Tarnow
(313) 234-5182