# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE CARACO PHARMACEUTICAL LABORATORIES, LTD. SECURITIES LITIGATION | Case No. 2:09-cv-12830-AJT-DAS |

---

### LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS; MEMORANDUM OF LAW IN SUPPORT THEREOF

---

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................. 1

II.     PROCEDURAL HISTORY .................................................................................. 4

III.    THE COURT SHOULD APPROVE THE PROPOSED SETTLEMENT ........................ 7

        A.    The Standards for Judicial Approval of Class Action Settlements ........................ 7

        B.    Evaluation of the Proposed Settlement ................................................................. 8

              1.    The Likelihood of Success on the Merits .................................................... 8

              2.    The Complexity, Expense, and Likely Duration Favor Settlement .......... 12

              3.    Stage of Proceedings and Extent of Discovery........................................ 14

              4.    The Settlement Is the Result of "Arm's-Length" Negotiations Among
                    Competent and Experienced Counsel ........................................................ 15

              5.    The Public Interest Favors Settlement ...................................................... 16

              6.    The Plan of Allocation of Settlement Proceeds Is Fair and Reasonable and
                    Should Be Approved.................................................................................. 17

IV.     CONCLUSION.................................................................................................... 18

i

# TABLE OF AUTHORITIES

Cases

*Backman v. Polaroid Corp.*,
  910 F.2d 10 (1st Cir. 1990) ................................................................................. 12

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979) ............................................................................... 12

*Bronson v. Bd. of Educ.*,
  604 F. Supp. 68 (S.D. Ohio 1984) ..................................................................... 7, 8

*Brotherton v. Cleveland*,
  141 F. Supp. 2d 894 (S.D. Ohio 2001) ............................................................. 7, 16

*Bryant v. Avado Brands, Inc.*,
  100 F. Supp. 2d 1368 (M.D. Ga. 2000), ............................................................. 12

*Bryant v. Dupree*,
  252 F.3d 1161 (11th Cir. 2001) ........................................................................... 12

*Cotton v. Hinton*,
  559 F.2d 1326 (5th Cir. 1977) ......................................................................... 7, 15

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ............................................................................................ 11

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ............................................................................................ 11

*Enter. Energy Corp. v. Columbia Gas Transmission Corp.*,
  137 F.R.D. 240 (S.D. Ohio 1991) ......................................................................... 7

*Granada Invs., Inc. v. DWG Corp.*,
  823 F. Supp. 448 (N.D. Ohio 1993) ................................................................... 7, 8

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  688 F.3d 713 (11th Cir. 2012) ............................................................................. 11

*In re Apple Computer Sec. Litig.*,
  No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) ................. 11

*In re Art Materials Antitrust Litig.*,
    100 F.R.D. 367 (N.D. Ohio 1983) ............................................................... 7, 12, 15

*In re Chambers Dev. Sec. Litig.*,
    912 F. Supp. 822 (W.D. Pa. 1995) ..................................................................... 13

*In re Chicken Antitrust Litig.*,
    810 F.2d 1017 (11th Cir. 1987) .......................................................................... 17

*In re Comshare, Inc. Sec. Litig.*,
    183 F.3d 542 (6th Cir. 1999) ................................................................................ 9

*In re Dun & Bradstreet Credit Servs. Customer Litig.*,
    130 F.R.D. 366 (S.D. Ohio 1990) ......................................................................... 8

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
    194 F.R.D. 166 (E.D. Penn 2000) ....................................................................... 12

*In re Nat'l Student Mktg. Litig.*,
    68 F.R.D. 151 (D.D.C. 1974) .............................................................................. 12

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997), ....................................................................... 17

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998) ................................................................................ 14

*In re Telectronics Pacing Sys., Inc.*,
    137 F. Supp. 2d 985 (S.D. Ohio 2001) ........................................................ passim

*Kogan v. AIMCO Fox Chase, L.P.*,
    193 F.R.D. 496 (E.D. Mich. 2000) ............................................................... passim

*Lewis v. Newman*,
    59 F.R.D 525 (S.D.N.Y. 1973) .......................................................................... 12

*Maywalt v. Parker & Parsley Petroleum Co.*,
    No. 92 Civ. 1152 (RWS), 1997 U.S. Dist. LEXIS 97 (S.D.N.Y. Jan. 9, 1997) ................. 17-18

*Olick v. Parker & Parsley Petroleum Co.*,
    145 F.3d 513 (2d Cir. 1998) ................................................................................ 18

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) .......................................................................... 11

*W. Va. v. Chas. Pfizer & Co. Inc.*,
  314 F. Supp. 710 (S.D.N.Y. 1970)........................................................................................... 12

*Walsh v. Great Atl. & Pac. Tea Co., Inc.*,
  726 F.2d 956 (3d Cir. 1983).................................................................................................... 17

*White v. NFL*,
  822 F. Supp. 1389 (D. Minn. 1993)........................................................................................ 17

*Williams v. First Nat'l Bank*,
  216 U.S 582 (1910).................................................................................................................. 7

*Williams v. Vukovich*,
  720 F.2d 909 (6th Cir. 1983) ....................................................................................... 7, 8, 9, 15

Pursuant to this Court's Order dated March 13, 2013, Lead Plaintiff Tushar Amin ("Lead Plaintiff"), along with Plaintiffs Kevin Koziatek and Jonathan Wilkof (collectively, "Plaintiffs"), respectfully move the Court, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for an order: (1) finally approving the settlement of this Litigation; and (2) approving the Plan of Allocation for the distribution of the Settlement Fund.

The grounds in support of this Motion are set forth within the Memorandum in Support of Final Approval of Class Action Settlement, and the Plan of Allocation, and the Declaration of Ex Kano S. Sams II, filed contemporaneously herewith.  A proposed order is also filed herewith.

Dated: May 21, 2013

GLANCY BINKOW & GOLDBERG LLP

By:  *s/ Ex Kano S. Sams II*
Lionel Z. Glancy
Peter A. Binkow
Ex Kano S. Sams II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

THE MILLER LAW FIRM, P.C.
E. Powell Miller
Christopher D. Kaye
Marc L. Newman
Courtney B. Ciullo
950 West University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852

*Lead Counsel and Class Counsel*

KENDALL LAW GROUP LLP
Joe Kendall
Jamie McKey
3232 McKinney, Suite 700
Dallas, TX 75204
Telephone: (214) 744-3000
Facsimile: (214) 744-3015

*Additional Counsel for the Class*

## I.    INTRODUCTION

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Co-Lead Plaintiff's counsel respectfully submit this memorandum of law in support of the motion for final approval of the proposed settlement of this securities class action with defendants, for a total amount of $2,975,000 in cash, and approval of the Plan of Allocation of settlement proceeds.    The terms of the settlement are set forth in the Stipulation, which was previously submitted to the Court.   The settlement is the result of extensive litigation and hard-fought settlement negotiations with the assistance of William A. Sankbeil, a highly respected mediator with substantial experience in the mediation of complex actions.

This case was vigorously investigated and litigated since its commencement.   From the outset, defendants have adamantly denied any liability and have fought Lead Plaintiff at every step.   The settlement was only achieved after Lead Plaintiff expended considerable effort in achieving the result obtained, including, but not limited to: (1) conducting an extensive investigation in connection with the filing of the Complaint in the Litigation; (2) briefing and prevailing against defendants' motion to dismiss; (3) reviewing a voluminous amount of documents produced during discovery; (4) preparing several comprehensive expert reports regarding issues related to class certification; (5) deposing defendants' expert in connection with class certification; (6) briefing and obtaining certification of the Class; (7) conducting interviews of potential witnesses; (8) consulting with experts in market efficiency, materiality, causation, and the amount of damages sustained by the Class; and (9) and defending plaintiffs' depositions and attending depositions that defendants took of third parties.   During settlement negotiations, Co-Lead Counsel made it clear that, while they were prepared to fairly assess the strengths and weaknesses of their case, they would continue to litigate rather than settle for less than an

amount that was in the best interest of the Class.  As a result, the settlement negotiations were hard fought, and an agreement-in-principle was only reached with the substantial assistance of mediator William A. Sankbeil.

Co-Lead Counsel, who are well respected and experienced in prosecuting securities class actions, have concluded that the settlement is a very good result and is clearly in the best interest of the Class.  This conclusion is based on, among other things: (1) the substantial and certain recovery obtained when weighed against the significant risk, expense, and delay presented in continuing this Litigation through the completion of discovery; (2) defendants' anticipated motions for summary judgment and the possibility of the Court ruling in favor of defendants with respect to such motions; (3) trial and probable appeal; (4) a complete analysis of the evidence adduced to date; (5) past experience in litigating complex actions similar to the present action; and (6) the serious disputes between the parties concerning the merits and damages.

Pursuant to an Order of this Court filed March 13, 2013, The Garden City Group, Inc. ("GCG"), the designated claims administrator, received information from American Stock Transfer & Trust Company, LLC – the transfer agent of Caraco Pharmaceutical Laboratories, Ltd. ("Caraco" or the "Company") – an Excel spreadsheet containing 86 names and addresses and was advised that it contained the contact information of known shareholders.  *See* Declaration of Jennifer M. Keough re Notice Dissemination and Publication ("Keough Decl."), ¶4.  On or about March 18, 2013, GCG loaded this data into a database established for this Litigation.  *Id.*  As in most class actions of this nature, the large majority of potential Class Members are beneficial purchasers whose securities are held in "street name" – *i.e.*, the securities are purchased by brokerage firms, banks, institutions and other third-party nominees in the name of the nominee, on behalf of the beneficial purchasers.  *Id.* at ¶5.  GCG maintains a proprietary

2

database with names and addresses of the largest and most common U.S. banks, brokerage firms, and nominees, including national and regional offices of certain nominees (the "Nominee Database"). *Id*. GCG's Nominee Database is updated from time to time as new nominees are identified and others go out of business. *Id*. At the time of the initial mailing, the Nominee Database contained 1,990 mailing records. *Id*.

GCG thereafter formatted the Notice Packet and caused it to be printed, personalized with the name and address of each potential Class Member and nominee, posted for first-class mail, postage pre-paid, and delivered on April 10, 2013, (the "Notice Date") to a United States Post Office for mailing to the shareholders and nominees identified on the mailing list. *Id*. at ¶6. On the Notice Date, a total of 2,076 Notice Packets were mailed. *Id*. at ¶7.[1] As of May 17, 2013, GCG received an additional 3,837 names and addresses of potential Class Members from individuals or from brokerage firms, banks, institutions, and other nominees requesting Notice Packets to be mailed. *Id*. at ¶8. GCG has also received requests from brokers and other nominee holders for 515 Notice Packets to be forwarded to them to thereafter be forwarded to their customers. *Id*. All such requests have been, and will continue to be, complied with in a timely manner. *Id*. As of May 17, 2013, an aggregate of 6,428 Notice Packets have been disseminated to potential Class Members and nominees by first-class mail. *Id*. at ¶9.

The Notice contained a brief description of the nature and procedural history of the Litigation and the terms of the settlement, the manner in which the settlement amount will be allocated among Class Members, and the claims that will be released. The Notice also advised

---

[1]     A copy of the Notice Packet is attached as Exhibit A to the Keough Decl. Additionally, the Preliminary Approval Order dictated, that no later than April 24, 2013, the Summary Notice be published once in *Investor's Business Daily* and, on a different day, once over *Globe Newswire*. Accordingly, GCG caused the Summary Notice to be published in *Investor's Business Daily* on April 19, 2013 and over *Globe Newswire* on April 22, 2013. A copy of the Summary Notice and confirmations of publication are attached as Exhibit B to the Keough Decl.

Class Members of their right to opt-out of the Class, or to object to any aspect of the settlement and the procedures for, and deadlines for, objecting to the settlement, the Plan of Allocation of settlement proceeds or counsel's request for an award of attorneys' fees and expenses.

For all the reasons discussed herein and in the Sams Decl., it is respectively submitted that the settlement is eminently fair, reasonable, and adequate to the Class and should be approved by the Court. Moreover, the Plan of Allocation of settlement proceeds, which was developed with the assistance of Co-Lead Counsel's economic expert and tracks the theory of damages in the case, is necessarily fair, reasonable, and adequate.

## II.   PROCEDURAL HISTORY

The following is a brief history of the Litigation. The Court is respectfully referred to the Sams Decl. for a more detailed description of the Litigation.

On July 17, 2009, a class action captioned *Wilkof v. Caraco Pharma. Labs., Ltd., et al.* was filed in the Court alleging claims under the federal securities laws against Defendants Caraco, Daniel H. Movens ("Movens"), and Mukul Rathi. Doc. 1.[2] On January 13, 2010, the Court entered a Stipulation and Order Appointing Lead Plaintiff and Approving Lead Plaintiff's Selection of Lead Counsel. Doc. 19.

On February 11, 2010, plaintiffs filed their Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws. Doc. 23. Plaintiffs named as defendants Caraco, Movens, Dilip Shanghvi, and Sun Pharmaceutical Industries, Ltd. ("Sun Pharma") – which owned Caraco. *Id.* Plaintiffs alleged that defendants made knowing and/or reckless misrepresentations and omissions concerning, among others, Caraco's compliance with the United States Food and Drug Administration's ("FDA") current Good Manufacturing

---

[2]   Unless otherwise indicated, all "Doc." references are to the Court's Electronic Case Filing docket entries.

Requirements ("cGMP") between May 29, 2008 and June 25, 2009, inclusive ("Class Period"). *Id*. Plaintiffs alleged that June 25, 2009 was the day of reckoning for Caraco and the culmination of defendants' misrepresentations and material omissions concerning Caraco's problems with, among other things, manufacturing generic pharmaceutical tablets of varying size and weight. *Id*. At the request of the FDA, U.S. Marshals raided Caraco's Michigan facilities – seizing drug products manufactured by Caraco in Farmington Hills and Wixom, as well as ingredients held at those facilities – citing "Caraco's continued failure to meet the FDA's [cGMP] requirements, which assure the quality of manufactured drugs" and indicated that through the seizure, "the FDA [was] seek[ing] to immediately stop the firm from further distributing drugs until there [was] an assurance that the firm complies with good manufacturing requirements." *Id*. at ¶134. Specifically, the FDA further noted that "[s]ince January 2009, Caraco has initiated voluntary recalls of drug products to protect the public from potentially defective medications" as the "recalls involved manufacturing defects, including oversized tablets and possible formulation error." *Id.* Thus, consumers of the Company's products and investors of the Company's securities finally learned the full extent of rampant and systematic manufacturing and regulatory problems at the Company. *Id*.

On April 12, 2010, defendants filed their motion to dismiss plaintiffs' complaint. Doc. 28. On May 27, 2010, plaintiffs filed their response to defendants' motion to dismiss. Doc. 32. Defendants filed their reply in support of their motion to dismiss on June 24, 2010. On October 21, 2010, the Court largely denied defendants' motion to dismiss – granting it with respect to Count 1 against Sun Pharma, but denying the remainder of defendants' motion. Doc. 39.

On December 1, 2010, defendants answered plaintiffs' complaint. Doc. 43. On February 16, 2011, the parties submitted a joint discovery plan. Subsequently, on April 15, 2011,

plaintiffs filed a motion for class certification.  Doc. 49.  Plaintiffs moved for the appointment of The Miller Firm, P.C., and Glancy Binkow & Goldberg LLP as class counsel.  The parties then conducted extensive discovery related to class certification, including the preparation of expert reports.  Plaintiffs also took the deposition of defendants' expert in connection with class certification issues.   On August 5, 2011, defendants opposed plaintiffs' motion for class certification.  On October 3, 2011, plaintiffs filed their reply in support of their motion for class certification.  Doc. 66.  On February 28, 2012, the Court granted plaintiffs' motion for class certification.  The parties then submitted an amended stipulation and order establishing a revised discovery plan on July 10, 2012.  Doc. 80.

On October 12, 2012, the parties participated in a mediation session before William A. Sankbeil.  Following the mediation session, the parties began to negotiate the basic terms of a settlement of this litigation.  Once the basic terms of the settlement were agreed to in principle, there were significant negotiations over the terms of the Stipulation of Settlement (the "Stipulation"), which included numerous discussions and exchanges of drafts of the Stipulation and its exhibits.  Throughout the course of those negotiations, the parties were represented by counsel with vast experience in litigation in general, and securities class actions in particular. The Settlement was the result of an adversarial process designed to produce a fair and honest compromise.

On February 28, 2013, Lead Plaintiff filed the Motion for Preliminary Approval of Class Action Settlement.  Doc. 82.  By Order dated March 13, 2012, the Court granted preliminary approval of the Settlement, held that the Settlement resulted from arm's-length negotiations and that the Stipulation was sufficiently fair, reasonable, and adequate as to the Settlement Class Members to warrant providing notice of the Settlement to Class Members, and appointed Garden

City Group to serve as the Claims Administrator.  Doc. 85.  The Court set a final settlement approval hearing date of June 25, 2013, at 2:30 p.m. (the "Settlement Fairness Hearing").  *Id.*

## III.    THE COURT SHOULD APPROVE THE PROPOSED SETTLEMENT

### A.    The Standards for Judicial Approval of Class Action Settlements

It is well settled that compromises of disputed claims are favored by the courts.  *Williams v. First Nat'l Bank*, 216 U.S 582, 595 (1910).  "Being a preferred means of dispute resolution, there is a strong presumption by courts in favor of settlement."  *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1027 (S.D. Ohio 2001); *see also Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("[I]n class action suits, there is an overriding public interest in favor of settlement."); *Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 246 (S.D. Ohio 1991) ("The law generally favors and encourages the settlement of class actions.").  Pursuant to Rule 23(e), a court should approve a class settlement if it is fair, adequate, and reasonable, and in the best interest of the class.  *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983); *Telectronics*, 137 F. Supp. 2d at 1008; *Brotherton v. Cleveland*, 141 F. Supp. 2d 894, 903 (S.D. Ohio 2001); *Granada Invs., Inc. v. DWG Corp.*, 823 F. Supp. 448, 453 (N.D. Ohio 1993); *Bronson v. Bd. of Educ.*, 604 F. Supp. 68, 71 (S.D. Ohio 1984); *In re Art Materials Antitrust Litig.*, 100 F.R.D. 367, 370 (N.D. Ohio 1983).

In determining whether a proposed settlement is fair, adequate, and reasonable, a court should look to the following factors: (1) the plaintiffs' likelihood of ultimate success on the merits balanced against the amount and form of relief offered in the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the judgment of experienced trial counsel; (5) the nature of the negotiations; (6) the objections raised by the class members; and (7) the public interest.

*Telectronics*, 137 F. Supp. 2d at 1009; *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 371 (S.D. Ohio 1990).  Courts have consistently utilized these factors in considering the fairness, reasonableness, and adequacy of proposed class action settlements.  *See, e.g., Williams*, 720 F.2d at 922; *Granada Invs.*, 823 F. Supp. at 453 (citing *Bronson*, 604 F. Supp. at 73).

In making such a determination, a court should not engage in a trial or mini-trial of the merits.  *Granada Invs.*, 823 F. Supp. at 453.  The view of experienced counsel favoring the settlement is entitled to great weight.  *Kogan v. AIMCO Fox Chase*, *L.P.*, 193 F.R.D. 496, 501 (E.D. Mich. 2000) (citing *Bronson*, 604 F. Supp. at 73).  A court should "defer to the judgment of experienced trial counsel who has [competently] evaluated the strength of his case." *Williams*, 720 F.2d at 922-23.  *See also Kogan*, 193 F.R.D. at 501.  Where, as here, a settlement is endorsed as fair by experienced and sophisticated counsel after rigorous arm's-length negotiations, there is a strong initial presumption that the compromise is fair and reasonable.

When examined under the applicable criteria, this settlement is a very good result for the Class.  Co-Lead Counsel believe that there are serious questions as to whether a more favorable monetary result against defendants could or would be attained after trial and the inevitable post-trial motions and appeals.  The settlement achieves a substantial and certain recovery for Class Members and is unquestionably superior to the distinct possibility that were this Litigation to proceed, there could be no recovery at all.  Analysis of the relevant factors demonstrates that the proposed settlement merits this Court's approval.

**B.      Evaluation of the Proposed Settlement**

**1.      The Likelihood of Success on the Merits**

One of the factors courts consider in approving a class action settlement is the plaintiffs'

likelihood of success on the merits balanced against the amount and form of relief offered in settlement. *Williams*, 720 F.2d at 922. As in every complex case of this kind, Lead Plaintiff faced formidable obstacles to recovery if litigation were to continue. The principal claims in this Litigation are based upon §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. While Co-Lead Counsel believe that they could prove the claims asserted, there is nevertheless a great deal of risk present, and there was certainly no guarantee that they would prevail at trial and ultimately collect on a larger judgment after trial and subsequent appeals. Rulings after the enactment of the Private Securities Litigation Reform Act of 1995 ("PSLRA") make it clear that the risk of no recovery has increased exponentially since the PSLRA was adopted.

Securities litigation generally involves complex issues of fact and law, and this case is no exception. For example, to establish liability under §10(b), Lead Plaintiff would bear the burden of proving, among other things, that defendants participated in the public dissemination of false or misleading information, that the information was material to investors in determining whether to invest in Caraco's securities, that the information impacted the market price of the common stock, caused damage to the Class, and that defendants acted with scienter. *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999).

Co-Lead Counsel believe that the claims asserted have substantial merit and would be able to establish that defendants' statements and omissions – alleged to be false and misleading – were, in fact, material misstatements or omissions and made with scienter for the §10(b) claims. Defendants, however, have adamantly denied any culpability throughout the Litigation. Assuming that Lead Plaintiff's claims survived defendants' anticipated motions for summary judgment after discovery was complete, at trial defendants would present evidence in support of

their contentions that there were no material misstatements or omissions, that they had a reasonable good faith belief in their actions at the time and that they did not act with scienter. Additionally, it is clear that if litigation had continued, Lead Plaintiff would face the risks of establishing liability posed by conflicting testimony and evidence.  While Lead Plaintiff's counsel believe the allegations are supported by the evidence adduced to date, defendants believe that the evidence does not support Lead Plaintiff's allegations and, in fact, are rebutted by the evidence adduced.  In addition, there was no certainty as to whether discovery would support Lead Plaintiff's allegations.  These risks would be exacerbated by the unpredictability of a lengthy and complex jury trial.  It is impossible to predict whether a jury would conclude that defendants made material misstatements.  Convincing a jury that defendants made material misrepresentations and/or omissions with the requisite scienter for the §10(b) claims – which defendants adamantly deny – is therefore subject to considerable uncertainty.  While Lead Counsel believes that the case was strong as to liability, they recognize that a finding by a jury was never assured.  Defendants had potentially valid defenses to Co-Lead Plaintiff's claims that could create significant risks to the recovery of the Class.

Even if Lead Plaintiff's counsel were to overcome the significant risks of proving liability, they would still face the risks of proving damages.  Defendants would argue that Lead Plaintiff could not prove loss causation because the price movement in the Company's stock was caused by other factors, including the overall stock market movements and industry factors. Defendants' loss causation arguments would have been bolstered by the Supreme Court decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 344-47 (2005).  The determination of damages is a complicated and uncertain process involving conflicting expert testimony.  Expert testimony could rest on many subjective assumptions, any of which could be rejected by a jury as

speculative or unreliable.   Lead Plaintiff would have likely faced a motion *in limine* by defendants to preclude Lead Plaintiff's damage expert's testimony under the test articulated in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and risked a decision that a valuation model might not be admissible in evidence.   Even if Lead Plaintiff survived the *Daubert* motion, at trial the loss causation and damage assessments of Lead Plaintiff's and defendants' experts were sure to vary substantially, and, in the end, this crucial element at trial would be reduced to a "battle of experts."   The reaction of a jury to such expert testimony is highly unpredictable.   In such a battle, Co-Lead Counsel recognize the possibility that a jury could be swayed by convincing experts for the defendants, and that a jury could find that there were no damages or only a fraction of the amount of damages that Lead Plaintiff contended. Additionally, a jury could have found that the losses were attributable to factors other than the alleged false and misleading statements.   *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (finding no loss causation and overturning $81 million jury verdict).

Even if Lead Plaintiff were to prevail at trial, risks to the Class remain.   For example, in *Hubbard v. BankAtlantic Bancorp, Inc*., 688 F.3d 713 (11th Cir. 2012), the Eleventh Circuit affirmed (on other grounds based upon a purported failure to adequately demonstrate loss causation) a judgment notwithstanding the verdict after a jury partially ruled in favor of plaintiffs in a securities fraud action.   Similarly, in *In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991), the jury rendered a verdict for plaintiffs after an extended trial.   Based upon the jury's findings, recoverable damages could have exceeded $100 million.   However, weeks later, the court overturned the verdict, entering judgment notwithstanding the verdict for the individual defendants and ordered a new trial with respect to the corporate defendant.   In another case, the class won a jury verdict and a motion for

11

judgment notwithstanding the verdict was denied, but on appeal the judgment was reversed and the case dismissed. *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990); *see also W. Va. v. Chas. Pfizer & Co., Inc.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970) ("It is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced."), *aff'd*, 440 F.2d 1079 (2d Cir. 1971); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial). Therefore, consideration of the above risks supports the approval of the settlement as fair, reasonable, and adequate.

### 2.     The Complexity, Expense, and Likely Duration Favor Settlement

Courts also consider the complexity, expense, and likely duration of the litigation in determining the fairness of a settlement. *Telectronics*, 137 F. Supp. 2d at 1013; *Art Materials*, 100 F.R.D. at 372.  There is no doubt this securities class action involved complex factual and legal issues.  As discussed above and in the Sams Decl., the various obstacles with which Lead Plaintiff would necessarily be confronted "flow from the complexities and difficulties inherently involved in shareholder securities fraud litigation." *In re Nat'l Student Mktg. Litig.*, 68 F.R.D. 151, 155 (D.D.C. 1974).  While courts have long recognized that "stockholder litigation is notably difficult and notoriously uncertain," *Lewis v. Newman*, 59 F.R.D 525, 528 (S.D.N.Y. 1973), "securities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA." *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Penn 2000); *see also Bryant v. Avado Brands, Inc.*, 100 F. Supp. 2d 1368, 1377 (M.D. Ga. 2000), *rev'd on other grounds sub nom. Bryant v. Dupree*, 252 F.3d 1161 (11th Cir. 2001).

If not for this settlement, the case would have continued to be fiercely contested by all parties.  Defendants have demonstrated a commitment to defend the case through and beyond

trial, if necessary, and are all represented by well-respected and highly-capable counsel.  The expense of continued litigation, moreover, would be substantial.  The parties would have had to complete a lengthy, extensive, and time-consuming discovery program, involving a review and analysis of documents from defendants and non-parties, and an extensive deposition program.  Experts would have to be designated and expert discovery conducted.  Inevitably, defendants would have filed motions for summary judgment.  Assuming Lead Plaintiff's claims survived defendants' expected motions for summary judgment, a pre-trial order would have to be prepared, proposed jury instructions would have to be submitted, and motions *in limine* would have to be argued.

Moreover, any trial involving some or all of the defendants would likely run several weeks.  Such a trial would have involved numerous attorneys, witnesses, experts and the introduction of voluminous documentary and deposition evidence, vigorously contested motions, and the expenditure of enormous amounts of judicial and counsel resources.  Even if successful at trial, appeals would be virtually assured.  Taking into account the likelihood of appeal, absent the settlement, this Litigation likely would have continued for years, despite the efforts of the Court and the parties to expedite the process.  *See In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 837 (W.D. Pa. 1995) ("It is safe to say, in a case of this complexity, the end of that road might be miles and years away.").

Even if the Class were to recover a larger judgment after trial – which was certainly not guaranteed – the additional delay, through summary judgment, trial, post-trial motions and the appellate process, would deny the Class any recovery for years.  The settlement secures a substantial and certain benefit for the Class in this complex and contested action, undiminished by further expenses, and without the delay, risk, and uncertainty of continued litigation.  *See In*

*re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998)

(settlement was favored where "the trial of this class action would be a long, arduous process

requiring great expenditures of time and money on behalf of both the parties and the court").

### 3.      Stage of Proceedings and Extent of Discovery

To ensure that plaintiffs have had access to sufficient information to evaluate their case

and to assess the adequacy of the settlement proposal, the stage of the proceedings and the extent

of discovery is another factor that courts consider in determining the fairness of the settlement.

*Telectronics*, 137 F. Supp. 2d at 1015; *Kogan*, 193 F.R.D. at 502.   In this action, both the

knowledge of Co-Lead Counsel and the proceedings themselves reached a stage where an

intelligent evaluation of the strengths and weaknesses of the Class' claims and the propriety of

the settlement could be made.

As set forth in the Sams Decl., this case has been vigorously litigated.   Prior to

settlement, Co-Lead Counsel conducted an extensive investigation.   This investigation included

an extensive review and analysis of available documents concerning the Company and

interviews with numerous witnesses, including former employees of the Company with specific

knowledge of the claims alleged.   Plaintiffs, moreover, reviewed a voluminous amount of

documents produced in discovery to assess the merits of their allegations against the

documentary evidence.   Additionally, the briefing on defendants' motion to dismiss and

plaintiffs' motion for class certification highlighted the factual and legal issues in the Litigation.

In addition, counsel consulted with experts in the fields of market efficiency, loss causation, and

damages.   Plaintiffs also took the deposition of defendants' expert regarding class certification

issues and obtained a better sense of the nature of defendants' arguments regarding these issues.

The parties also participated in hard-fought settlement negotiations where the strengths and weaknesses of the parties' respective claims and defenses were fully explored.

There is no question that Lead Plaintiff's counsel were in a position to evaluate the strengths and weaknesses of the claims asserted and defenses raised by defendants, as well as the substantial risks of continued litigation and the propriety of settlement. Having sufficient information to properly evaluate the case, Co-Lead Counsel have settled this Litigation on terms highly favorable to the Class without the substantial expense, risk, and uncertainty of continued litigation.

### 4. The Settlement Is the Result of "Arm's-Length" Negotiations Among Competent and Experienced Counsel

In appraising the fairness of the proposed settlement, the court is entitled to rely heavily on the opinion of competent counsel. *Williams*, 720 F.2d at 922-23; *Telectronics*, 137 F. Supp. 2d at 1015-16; *Art Materials*, 100 F.R.D. at 371. This principle is especially true where the stage of the proceedings indicates that counsel and the court are fully capable of evaluating the merits of plaintiffs' case and the probable course of future litigation. *See Cotton*, 559 F.2d at 1330; *Kogan*, 193 F.R.D. at 502. As set forth above and in the Sams Decl., the knowledge of Co-Lead Counsel and the proceedings themselves reached a stage where Co-Lead Counsel could make an intelligent evaluation of the strengths and weaknesses of the Class' claims and the propriety of settlement.

In evaluating the proposed settlement and the opinion of counsel, the court may examine the negotiating process that took place between the parties to confirm that there was no collusion in reaching the settlement. Here, experienced counsel for all parties – each with a comprehensive understanding of the strengths and weaknesses of the respective claims and defenses of each party – negotiated this settlement. Indeed, the settlement is the product of hard

15

fought arm's-length negotiations between the parties with the substantial assistance of William A. Sankbeil, a highly respected mediator with substantial experience in the mediation of complex actions.  In fact, after the mediation session, the parties continued to aggressively support their clients' respective interests for months afterward until the settlement was eventually finalized. As a result of the mediation process – which extended well beyond a single-day session – and the additional efforts of Lead Counsel, the parties ultimately reached an agreement-in-principle to settle the Litigation.  During all of these negotiations, Co-Lead Plaintiff's counsel made it very clear that while they were prepared to fairly assess the strengths and weaknesses of the claims asserted, they would continue to litigate rather than settle for less than fair value.  As a result of the negotiation process, Co-Lead Counsel carefully considered and evaluated, among other things, the relevant legal authorities and evidence to support the claims asserted against defendants, the likelihood of prevailing on these claims, and the risk, expense, and duration of continued litigation.  Based upon this assessment, Co-Lead Counsel have made a considered judgment that the settlement for $2,975,000 million is not only fair and reasonable, but, under the circumstances, is a very good settlement for the Class.  This fact also supports the Court's approval of the settlement.

### 5.    The Public Interest Favors Settlement

As discussed above, the settlement provides a substantial recovery to a class of damaged shareholders in the form of a settlement fund of $2,975,000, and demonstrates the viability of the private enforcement of the federal securities laws.  It is certainly possible that the Class might not ultimately prevail after continued litigation.  *See, e.g., Brotherton*, 141 F. Supp. 2d at 906. The settlement puts an end to contentious and protracted litigation, which, absent settlement,

would have likely continued for many more months and possibly several years in this Court or in the Court of Appeals despite the best efforts of the parties and the Court to expedite the process.

      **6.**    **The Plan of Allocation of Settlement Proceeds Is Fair and Reasonable and Should Be Approved**

The Notice contains the Plan of Allocation of settlement proceeds, detailing how the settlement proceeds are to be divided among claiming Class Members.  A trial court has broad discretion in approving a plan of allocation.  *In re Chicken Antitrust Litig.*, 810 F.2d 1017, 1019 (11th Cir. 1987).  The test is simply whether the proposed plan, like the settlement itself, is fair, reasonable and adequate.  *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 132 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997); *Walsh v. Great Atl. & Pac. Tea Co., Inc.*, 726 F.2d 956, 964 (3d Cir. 1983) ("The court's principal obligation is simply to ensure that the fund distribution is fair and reasonable.").  In determining whether a proposed plan is fair, courts look primarily to the opinion of counsel.  *See Paine Webber*, 171 F.R.D. at 133 ("[T]he adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information."); *see also White v. NFL*, 822 F. Supp. 1389, 1420 (D. Minn. 1993) (stating that "[t]he court.... affords considerable weight to the opinion of experienced and competent counsel that is based on their informed understanding of the legal and factual issues involved" in approving distribution of settlement proceeds).

Here, working with their damage expert, Co-Lead Counsel have developed the Plan of Allocation of settlement proceeds that reflects their damage theory of the case in a simple and straightforward manner and will result in a fair distribution of the available proceeds among members of the Class.  Courts also consider the reaction of a class to a plan of allocation.  *See PaineWebber*, 171 F.R.D. at 126; *Maywalt v. Parker & Parsley Petroleum Co.*, No. 92 Civ. 1152

(RWS), 1997 U.S. Dist. LEXIS 97, at *1112 (S.D.N.Y. Jan. 9, 1997), *aff'd sub nom. Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513 (2d Cir. 1998).   The Notice described the proposed Plan of Allocation of settlement proceeds in detail.   The Plan of Allocation of settlement proceeds should be approved as fair, reasonable, and adequate.

## IV.    CONCLUSION

For the foregoing reasons, Co-Lead Counsel respectfully request that the Court approve the settlement and the Plan of Allocation of settlement proceeds as fair, reasonable, and adequate and in the best interests of the Class.

Dated:  May 21, 2013                  GLANCY BINKOW & GOLDBERG LLP

By:  *s/ Ex Kano S. Sams II*
Lionel Z. Glancy
Peter A. Binkow
Ex Kano S. Sams II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

THE MILLER LAW FIRM, P.C.
E. Powell Miller
Christopher D. Kaye
Marc L. Newman
Courtney B. Ciullo
950 West University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852

*Lead Counsel and Class Counsel*

KENDALL LAW GROUP LLP
Joe Kendall
Jamie McKey
3232 McKinney, Suite 700
Dallas, TX 75204
Telephone: (214) 744-3000
Facsimile: (214) 744-3015

*Additional Counsel for the Class*

## CERTIFICATE OF SERVICE

I, Ex Kano S. Sams II, certify that on May 21, 2013, I electronically filed the following document with the Clerk of the Court using the ECF system which will send notification of such filing to the parties listed on the attached Court's ECF Service List: LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS; MEMORANDUM OF LAW IN SUPPORT THEREOF.  There are no known non-ECF participants.

**See Attached Service List.**

GLANCY BINKOW & GOLDBERG LLP

*/s/ Ex Kano S. Sams II*
Ex Kano S. Sams II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Email:  esams@glancylaw.com

# Mailing Information for a Case 2:09-cv-12830-AJT-DAS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Peter A. Binkow**
  pbinkow@glancylaw.com

- **Margaret A. Goetze - NOT SWORN**
  mgoetze@briggs.com,dburrell@briggs.com

- **E. Powell Miller**
  epm@millerlawpc.com,aad@millerlawpc.com,ach@millerlawpc.com

- **Marc L. Newman**
  mln@millerlawpc.com,ach@millerlawpc.com,asl@millerlawpc.com

- **Ex Kano S Sams - NOT SWORN , II**
  esams@glancylaw.com

- **Frank A. Taylor**
  ftaylor@briggs.com,mgoetze@briggs.com

- **S. Thomas Wienner**
  twienner@wiennergould.com,jtibbs@wiennergould.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`